ELLIS ET AL. *v.* BROTHERHOOD OF RAILWAY, AIRLINE & STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS & STATION EMPLOYES ET AL.

No. 82–1150.   Argued January 9, 1984—Decided April 25, 1984

436

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, and in Parts I, II, III, IV, and V (except Subdivision 1) of which POWELL, J., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 457.

*Michael E. Merrill* argued the cause and filed briefs for petitioners.

*Laurence Gold* argued the cause for respondents. With him on the brief were *George Kaufmann* and *James Coppess*.*

---

*Briefs of *amici curiae* urging reversal were filed for the Legal Foundation of America by *David Crump;* and for the Mid-Atlantic Legal Foundation et al. by *Myrna P. Field*.

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *J. Albert Woll* and *Marsha Berzon;* and for the National Education Association by *Robert H. Chanin*.

Briefs of *amici curiae* were filed for the State Bar of California by *Seth M. Hufstedler* and *Robert S. Thompson;* and for Eddie Keller et al. by *Ronald A. Zumbrun* and *Anthony T. Caso*.

438

JUSTICE WHITE delivered the opinion of the Court.

In 1951, Congress amended the Railway Labor Act (Act or RLA) to permit what it had previously prohibited—the union shop. Section 2, Eleventh of the Act permits a union and an employer to require all employees in the relevant bargaining unit to join the union as a condition of continued employment. 45 U. S. C. § 152, Eleventh.[1] In *Machinists* v. *Street*, 367 U. S. 740 (1961), the Court held that the Act does not authorize a union to spend an objecting employee's money to support political causes. The use of employee funds for such ends is unrelated to Congress' desire to eliminate "free riders" and the resentment they provoked. *Id.*, at 768–769. The Court did not express a view as to "expenditures for activities in the area between the costs which led directly to the complaint as to 'free riders,' and the expenditures to support

---

[1] Section 2, Eleventh provides in relevant part:

"Eleventh. Notwithstanding any other provisions of this Act, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this Act and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

"(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership . . . ." 64 Stat. 1238, 45 U. S. C. § 152, Eleventh.

union political activities." *Id.*, at 769–770, and n. 18. Petitioners challenge just such expenditures.

I

In 1971, respondent Brotherhood of Railway, Airline and Steamship Clerks (union or BRAC) and Western Airlines implemented a previously negotiated agreement requiring that all Western's clerical employees join the union within 60 days of commencing employment. As the agreement has been interpreted, employees need not become formal members of the union, but must pay agency fees equal to members' dues. Petitioners are present or former clerical employees of Western who objected to the use of their compelled dues for specified union activities.[2] They do not contest the legality of the union shop as such, nor could they. See *Railway Employees* v. *Hanson*, 351 U. S. 225 (1956). They do contend, however, that they can be compelled to contribute no more than their pro rata share of the expenses of negotiating agreements and settling grievances with Western Airlines.[3] Respondents—the national union, its board of adjustment, and three locals—concede that the statutory authorization of the union shop does not permit the use of petitioners' con-

---

[2] This case is the consolidation of two separate suits, one brought by present and former Western employees who did not join the union, *Ellis* v. *Railway Clerks*, the other a class action brought by employees who did, *Fails* v. *Railway Clerks*.

[3] Each class member sent the following letter to the union:

"As an employee of Western Airlines, I feel that the Brotherhood of Railway, Airline and Steamship Clerks does not properly represent my interests and I protest the compulsory 'agency fee' I must pay the Brotherhood of Railway, Airline and Steamship Clerks, in order to retain my job. In addition, I hereby protest the use of these fees for any purpose other than the cost of collective bargaining and specifically protest the support of Legislative goals, candidates for political office, political efforts of any kind or nature, ideological causes, and any other activity which is not a direct cost of collective bargaining on my behalf. I demand an accounting and refund from the Brotherhood of Railway, Airline and Steamship Clerks of all fees exacted from me by the so-called 'agency fee.'" 3 App. 234–235.

tributions for union political or ideological activities, see *Machinists* v. *Street, supra,* and have adopted a rebate program covering such expenditures. The parties disagree about the adequacy of the rebate scheme, and about the legality of burdening objecting employees with six specific union expenses that fall between the extremes identified in *Hanson* and *Street:* the quadrennial Grand Lodge convention, litigation not involving the negotiation of agreements or settlement of grievances, union publications, social activities, death benefits for employees, and general organizing efforts.

The District Court for the Southern District of California granted summary judgment to petitioners on the question of liability. Relying entirely on *Street,* it found that the six expenses at issue here, among others, were all "non-collective bargaining activities" that could not be supported by dues collected from protesting employees.[4] After a trial on damages, the court concluded that with regard to political and ideological activities, the union's existing rebate program, under which objecting employees were ultimately reimbursed for their share of union expenditures on behalf of political and charitable causes, was a good-faith effort to comply with legal requirements and adequately protected employees' rights. Relying on exhibits presented by respondents, the court ordered refunds of approximately 40% of dues paid for the expenditures at issue here. It also required that protesting employees' annual dues thereafter be reduced by the amount spent on activities not chargeable to them during the prior year. The court seems to have envisioned that this scheme would supplant the already-existing rebate scheme, for it included political expenditures among those to be figured into the dues reduction.

The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. 685 F. 2d 1065 (1982). It held that

---

[4] The court certified this ruling for interlocutory appeal under 28 U. S. C. § 1292(b). The Court of Appeals for the Ninth Circuit did not permit the appeal.

the union's rebate plan was adequate even though it allowed the union to collect the full amount of a protesting employee's dues, use part of the dues for objectionable purposes, and only pay the rebate a year later. It found suggestions in this Court's cases that such a method would be acceptable, and had itself approved the rebate approach in an earlier case. The opinion did not address the dues reduction scheme imposed by the District Court. *Id.*, at 1069–1070. Turning to the question of permissible expenditures, the Court of Appeals framed "the relevant inquiry [a]s whether a particular challenged expenditure is germane to the union's work in the realm of collective bargaining. . . . [That is, whether it] can be seen to promote, support or maintain the union as an effective collective bargaining agent." *Id.*, at 1072, 1074–1075. The court found that each of the challenged activities strengthened the union as a whole and helped it to run more smoothly, thus making it better able to negotiate and administer agreements. Because the six activities ultimately benefited the union's collective-bargaining efforts, the union was free to finance them with dues collected from objecting employees. One judge dissented, arguing that these were all "institutional expenses" that objecting employees cannot be forced to pay. *Id.*, at 1075–1076.

Petitioners sought review of the Court of Appeals' ruling on permissible expenses and the adequacy of the rebate scheme. We granted certiorari. 460 U. S. 1080 (1983). We hold that the union's rebate scheme was inadequate and that the Court of Appeals erred in finding that the RLA authorizes a union to spend compelled dues for its general litigation and organizing efforts.

## II

### A

There is some question as to whether petitioners' challenge to the rebate program is properly before us. In 1980, within a month of the entry of the District Court's judgment, the

union was decertified as the bargaining representative of Western Airlines' clerical employees. Thus, none of the petitioners is presently represented by the union or required to pay dues to it. Petitioners' claim for an injunction against the rebate scheme would therefore appear to be moot. But petitioners also sought money damages,[5] and damages for an illegal rebate program would necessarily have been in the form of interest on money illegally held for a period of time. That claim for damages remains in the case. The amount at issue is undeniably minute. But as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot. *Powell* v. *McCormack*, 395 U. S. 486, 496–498 (1969).

Respondents argue that the Court of Appeals erred in addressing the validity of the union's rebate scheme because it had been supplanted by the District Court's order, from which the union had not appealed. They also contend that, for the same reason, the adequacy of the old system is "not justiciable" and "academic." Brief for Respondents 11, and n. 5. We disagree. The District Court specifically held that the rebate scheme vindicated the dissenting employees' rights with regard to political and ideological activities, and the Court of Appeals affirmed. The Court of Appeals also held that the expenditures the union had included in the rebate scheme were the only ones to which protesting employees could not be compelled to contribute, thereby eliminating the basis for the District Court's additional order that the union reduce dues prospectively. In any event, even though the District Court required a dues reduction scheme for the future, petitioners did not receive damages for the prior allegedly inadequate rebate program, precisely because

---

[5] In their complaints, petitioners made a generalized claim for "monetary damages for injuries sustained as a result of defendants' unlawful and unwarranted interference with and deprivation of their constitutional, civil, statutory and contractual rights." 1 App. 13.

both lower courts upheld it. In these circumstances, the issue is properly before us.[6]

B

As the Court of Appeals pointed out, there is language in this Court's cases to support the validity of a rebate program. *Street* suggested "restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed." 367 U. S., at 775. See also *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 238 (1977). On the other hand, we suggested a more precise advance reduction scheme in *Railway Clerks* v. *Allen*, 373 U. S. 113, 122 (1963), where we described a "practical decree" comprising a refund of exacted funds in the proportion that union political expenditures bore to total union expenditures and the reduction of future exactions by the same proportion. Those opinions did not, nor did they purport to, pass upon the statutory or constitutional adequacy of the suggested remedies.[7] Doing so now, we hold that the pure rebate approach is inadequate.

---

[6] Not before us is the adequacy of the dues reduction scheme imposed by the District Court. The issue is not among the questions presented by the petition for certiorari, the Court of Appeals did not address it, and the record does not reveal whether the scheme was ever implemented.

[7] The courts that have considered this question are divided. Compare *Robinson* v. *New Jersey*, 547 F. Supp. 1297 (NJ 1982); *School Committee* v. *Greenfield Education Assn.*, 385 Mass. 70, 431 N. E. 2d 180 (1982); *Robbinsdale Education Assn.* v. *Robbinsdale Federation of Teachers*, 307 Minn. 96, 239 N. W. 2d 437, vacated and remanded, 429 U. S. 880 (1976) (all holding or suggesting that such a scheme does not adequately protect the rights of dissenting employees), with *Seay* v. *McDonnell Douglas Corp.*, 533 F. 2d 1126, 1131 (CA9 1976); *Opinion of the Justices*, 401 A. 2d 135 (Me. 1979); *Association of Capitol Powerhouse Engineers* v. *Division of Bldg. & Grounds*, 89 Wash. 2d 177, 570 P. 2d 1042 (1977) (all upholding rebate programs). See generally *Perry* v. *Local 2569*, 708 F. 2d 1258, 1261–1262 (CA7 1983).

By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory authorization. The cost to the employee is, of course, much less than if the money was never returned, but this is a difference of degree only. The harm would be reduced were the union to pay interest on the amount refunded, but respondents did not do so. Even then the union obtains an involuntary loan for purposes to which the employee objects.

The only justification for this union borrowing would be administrative convenience. But there are readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts, that place only the slightest additional burden, if any, on the union. Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily. A rebate scheme reduces but does not eliminate the statutory violation.

## III

Petitioners' primary submission is that the use of their fees to finance the challenged activities violated the First Amendment. This argument assumes that the Act allows these allegedly unconstitutional exactions. When the constitutionality of a statute is challenged, this Court first ascertains whether the statute can be reasonably construed to avoid the constitutional difficulty. *E. g.*, *Califano* v. *Yamasaki*, 442 U. S. 682, 692–693 (1979); *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (concurring opinion); *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932). As the Court noted when faced with a similar claim in *Street*, "the restraints against unnecessary constitutional decisions counsel against" addressing petitioners' constitutional claims "unless we must conclude that Congress, in authorizing a union shop under § 2, Eleventh also meant that the labor organization receiving an employee's money should be free, despite that employee's objection, to

spend his money" for these activities.    367 U. S., at 749. We therefore first inquire whether the statute permits the union to charge petitioners for any of the challenged expenditures.

## IV

Section 2, Eleventh contains only one explicit limitation to the scope of the union shop agreement: objecting employees may not be required to tender "fines and penalties" normally required of union members.    45 U. S. C. § 152, Eleventh.[8] If there were nothing else, an inference could be drawn from this limited exception that all other payments obtained from voluntary members can also be required of those whose membership is forced upon them.    Indeed, several witnesses appearing before the congressional Committees objected to the absence of any explicit limitation on the scope or amount of fees and dues that could be compelled.[9]    That Congress

---

[8] Senator Hill, one of the bill's sponsors, explained on the Senate floor that " 'assessments' is not to include 'fines and penalties.'    Thus if an individual member is fined for some infraction of the union bylaws or constitution, the union cannot obtain his discharge under a union-shop agreement in the event that the member refuses or fails to pay the fine imposed."    96 Cong. Rec. 15736 (1950).

[9] Jacob Aronson, vice president of the New York Central Railroad, complained that "the proposal does not even limit the number, kind, or amount of dues, fees, and assessments that may be required by the particular union."    Hearings on H. R. 7789 before the House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., 121 (1950) (House Hearings).    See also Hearings on S. 3295 before a Subcommittee of the Senate Committee on Labor and Public Welfare, 81st Cong., 2d Sess., 173–174 (1950) (Senate Hearings).    Daniel Loomis, appearing for the Association of Western Railways, objected that "[w]ithout any limitation upon the right of the organizations to levy dues, fees, or assessments all employees could be made subject to unwarranted and unlimited deductions from their pay and would have no voice as to the kind or amount of such dues, fees, or assessments.    Such funds as were thus raised could be used indiscriminately by the organizations and in many cases solely at the discretion of the officers of the organizations."    House Hearings, at 160; see also Senate Hearings, at 316–317.

enacted the provision over these objections arguably indicates that it was willing to tolerate broad exactions from objecting employees.

Furthermore, Congress was well aware of the broad scope of traditional union activities. The hearing witnesses referred in general terms to the costs of "[a]ctivities of labor organizations resulting in the procurement of employee benefits," House Hearings, at 10 (testimony of George Harrison), and the "policies and activities of labor unions," *id.*, at 50 (testimony of George Weaver). Indeed, it was pointed out that not only was the "securing and maintaining of a collective bargaining agreement . . . an expensive undertaking . . . , there are many other programs of a union" that require the financial and moral support of the workers. *Id.*, at 275; Senate Hearings, at 236 (statement of Theodore Brown). In short, Congress was adequately informed about the broad scope of union activities aimed at benefiting union members, and, in light of the absence of express limitations in § 2, Eleventh it could be plausibly argued that Congress purported to authorize the collection from involuntary members of the same dues paid by regular members. This view, however, was squarely rejected in *Street,* over the dissents of three Justices, and the cases that followed it.

In *Street,* the Court observed that the purpose of § 2, Eleventh was to make it possible to require all members of a bargaining unit to pay their fair share of the costs of performing the function of exclusive bargaining agent. The union shop would eliminate "free riders," employees who obtained the benefit of the union's participation in the machinery of the Act without financially supporting the union. That purpose, the Court held, Congress intended to be achieved without "vesting the unions with unlimited power to spend exacted money." 367 U. S., at 768. Undoubtedly, the union could collect from all employees what it needed to defray the expenses entailed in negotiating and administering a collective agreement and in adjusting grievances and disputes. The

Court had so held in *Railway Employees* v. *Hanson*, 351 U. S. 225 (1956). But the authority to impose dues and fees was restricted at least to the "extent of denying the unions the right, over the employee's objection, to use his money to support political causes which he opposes," 367 U. S., at 768, even though Congress was well aware that unions had historically expended funds in the support of political candidates and issues. Employees could be required to become "members" of the union, but those who objected could not be burdened with any part of the union's expenditures in support of political or ideological causes. The Court expressed no view on other union expenses not directly involved in negotiating and administering the contract and in settling grievances.

*Railway Clerks* v. *Allen*, 373 U. S. 113 (1963), reaffirmed the approach taken in *Street*, and described the union expenditures that could fairly be charged to all employees as those "germane to collective bargaining." *Id.*, at 121, 122. Still later, in *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), we found no constitutional barrier to an agency shop agreement between a municipality and a teachers' union insofar as the agreement required every employee in the unit to pay a service fee to defray the costs of collective bargaining, contract administration, and grievance adjustment. The union, however, could not, consistently with the Constitution, collect from dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent. In neither *Allen* nor *Abood*, however, did the Court find it necessary further to define the line between union expenditures that all employees must help defray and those that are not sufficiently related to collective bargaining to justify their being imposed on dissenters.

We remain convinced that Congress' essential justification for authorizing the union shop was the desire to eliminate free riders—employees in the bargaining unit on whose behalf the union was obliged to perform its statutory functions, but who refused to contribute to the cost thereof. Only a

union that is certified as the exclusive bargaining agent is authorized to negotiate a contract requiring all employees to become members of or to make contributions to the union. Until such a contract is executed, no dues or fees may be collected from objecting employees who are not members of the union; and by the same token, any obligatory payments required by a contract authorized by § 2, Eleventh terminate if the union ceases to be the exclusive bargaining agent. Hence, when employees such as petitioners object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

With these considerations in mind, we turn to the particular expenditures for which petitioners insist they may not be charged.

V

1. *Conventions.* Every four years, BRAC holds a national convention at which the members elect officers, establish bargaining goals and priorities, and formulate overall union policy. We have very little trouble in holding that petitioners must help defray the costs of these conventions. Surely if a union is to perform its statutory functions, it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy. Conventions such as those at issue here are normal events about

which Congress was thoroughly informed [10] and seem to us to be essential to the union's discharge of its duties as bargaining agent. As the Court of Appeals pointed out, convention "activities guide the union's approach to collective bargaining and are directly related to its effectiveness in negotiating labor agreements." 685 F. 2d, at 1073. In fact, like all national unions, BRAC is required to hold either a referendum or a convention at least every five years for the election of officers. 29 U. S. C. § 481(a). We cannot fault it for choosing to elect its officers at a convention rather than by referendum.

2. *Social Activities.* Approximately 0.7% of Grand Lodge expenditures go toward purchasing refreshments for union business meetings and occasional social activities. 685 F. 2d, at 1074. These activities are formally open to nonmember employees. Petitioners insist that these expenditures are entirely unrelated to the union's function as collective-bargaining representative and therefore could not be charged to them. While these affairs are not central to collective bargaining, they are sufficiently related to it to be charged to all employees. As the Court of Appeals noted, "[t]hese small expenditures are important to the union's members because they bring about harmonious working relationships,

---

[10] For example, George Harrison, then president of BRAC, took conventions as his example when asked to explain the difference between dues and assessments: "It may be that they have an international union convention every 4 years and they have a convention expense assessment to cover the cost of holding those conventions. The fireman would pay that expense as an extra assessment over and above his dues, while in my union the dues would cover all of that, and we would make a distribution internally to the different funds." House Hearings, at 257–258. See also Senate Hearings, at 128 (testimony of Paul Monahan of the United Railroad Workers) (conventions are "an extremely costly proposition"; in order to give "our membership *and the people for whom we bargain* the best representation at the least possible cost" conventions are held biannually rather than annually) (emphasis added).

promote closer ties among employees, and create a more pleasant environment for union meetings." *Ibid.*

We cannot say that these *de minimis* expenses are beyond the scope of the Act. Like conventions, social activities at union meetings are a standard feature of union operations. In a revealing statement, Senator Thomas, Chairman of the Senate Subcommittee, made clear his disinclination to have Congress define precisely what normal, minor union expenses could be charged to objectors; he did not want the bill to say that "the unions . . . must not have any of the . . . kinds of little dues that they take up for giving a party, or something of that nature." Senate Hearings, at 173–174. There is no indication that other Members of Congress were any more inclined to scrutinize the minor incidental expenses incurred by the union in running its operations.

3. *Publications.* The Grand Lodge puts out a monthly magazine, the Railway Clerk/interchange, paid for out of the union treasury. The magazine's contents are varied and include articles about negotiations, contract demands, strikes, unemployment and health benefits, proposed or recently enacted legislation, general news, products the union is boycotting, and recreational and social activities. See 685 F. 2d, at 1074; District Court's Findings of Fact, 3 App. 236; Brief for Petitioners 22; Brief for Respondents 32, and n. 19. The Court of Appeals found that the magazine "is the union's primary means of communicating information concerning collective bargaining, contract administration, and employees' rights to employees represented by BRAC." 685 F. 2d, at 1074. Under the union's rebate policy, objecting employees are not charged for that portion of the magazine devoted to "political causes." App. Exhibits 436. The rebate is figured by calculating the number of lines that are devoted to political issues as a proportion of the total number of lines. Tr. of Oral Arg. 38.

The union must have a channel for communicating with the employees, including the objecting ones, about its activities.

Congress can be assumed to have known that union funds go toward union publications; it is an accepted and basic union activity. The costs of "worker education" were specifically mentioned during the hearings. House Hearings, at 275; Senate Hearings, at 236. The magazine is important to the union in carrying out its representational obligations and a reasonable way of reporting to its constituents.

Respondents' limitation on the publication costs charged objecting employees is an important one, however. If the union cannot spend dissenters' funds for a particular activity, it has no justification for spending their funds for writing about that activity.[11] By the same token, the Act surely allows it to charge objecting employees for reporting to them about those activities it can charge them for doing.

4. *Organizing.* The Court of Appeals found that organizing expenses could be charged to objecting employees because organizing efforts are aimed toward a stronger union, which in turn would be more successful at the bargaining table. Despite this attenuated connection with collective bargaining, we think such expenditures are outside Congress' authorization. Several considerations support this conclusion.

First, the notion that §2, Eleventh would be a tool for the expansion of overall union power appears nowhere in the legislative history. To the contrary, BRAC's president expressly disclaimed that the union shop was sought in order to strengthen the bargaining power of unions.[12] "Nor was any

---

[11] Given our holding that objecting employees cannot be charged for union organizing or litigation, they cannot be charged for the expense of reporting those activities to the membership.

[12] When asked if the union shop would "strengthen your industry-wide bargaining as presently exists in the railroad industry," Harrison replied:

"I do not think it would affect the power of bargaining one way or the other . . . . If I get a majority of the employees to vote for my union as the bargaining agent, I have got as much economic power at that stage of development as I will ever have. The man that is going to scab—he will

claim seriously advanced that the union shop was necessary to hold or increase union membership." *Street,* 367 U. S., at 763, n. 13. Thus, organizational efforts were not what Congress aimed to enhance by authorizing the union shop.

Second, where a union shop provision is in place and enforced, all employees in the relevant unit are already organized. By definition, therefore, organizing expenses are spent on employees outside the collective-bargaining unit already represented.[18] Using dues exacted from an objecting employee to recruit members among workers outside the bargaining unit can afford only the most attenuated benefits to collective bargaining on behalf of the dues payer.

Third, the free-rider rationale does not extend this far. The image of the smug, self-satisfied nonmember, stirring up resentment by enjoying benefits earned through other employees' time and money, is completely out of place when it comes to the union's overall organizing efforts. If one accepts that what is good for the union is good for the employees, a proposition petitioners would strenuously deny, then it may be that employees will ultimately ride for free on the union's organizing efforts outside the bargaining unit. But the free rider Congress had in mind was the employee the union was required to represent and from whom it could not withhold benefits obtained for its members. Nonbargaining unit organizing is not directed at that employee.

---

scab whether he is in or out of the union, and it does not make any difference." House Hearings, at 20–21.

[18] The District Court found that the organizing expenses here were spent in part to recruit new union members within the bargaining unit. This is because the collective-bargaining agreement involved in this case is administered as an agency shop rather than a union shop provision. By its terms, § 2, Eleventh authorizes negotiation of a union shop; it may be read to authorize negotiation of an agency shop. See *NLRB* v. *General Motors Corp.,* 373 U. S. 734 (1963) (interpreting the equivalent provision in the National Labor Relations Act). But it would be perverse to read it as allowing the union to charge to objecting nonmembers part of the costs of attempting to convince them to become members.

Organizing money is spent on people who are not union members, and only in the most distant way works to the benefit of those already paying dues. Any free-rider problem here is roughly comparable to that resulting from union contributions to pro-labor political candidates. As we observed in *Street,* that is a far cry from the free-rider problem with which Congress was concerned.

5. *Litigation.* The expenses of litigation incident to negotiating and administering the contract or to settling grievances and disputes arising in the bargaining unit are clearly chargeable to petitioners as a normal incident of the duties of the exclusive representative. The same is true of fair representation litigation arising within the unit, of jurisdictional disputes with other unions, and of any other litigation before agencies or in the courts that concerns bargaining unit employees and is normally conducted by the exclusive representative. The expenses of litigation not having such a connection with the bargaining unit are not to be charged to objecting employees. Contrary to the view of the Court of Appeals, therefore, unless the Western Airlines bargaining unit is directly concerned, objecting employees need not share the costs of the union's challenge to the legality of the airline industry mutual aid pact; of litigation seeking to protect the rights of airline employees generally during bankruptcy proceedings; or of defending suits alleging violation of the nondiscrimination requirements of Title VII of the Civil Rights Act of 1964.

6. *Death benefits.* BRAC pays from its general funds a $300 death benefit to the designated beneficiary of any member or nonmember required to pay dues to the union. In *Street,* the Court did not adjudicate the legality under § 2, Eleventh of compelled participation in a death benefit program, citing it as an example of an expenditure in the area between the costs which led directly to the complaint as to "free riders," and the expenditures to support union political activities. 367 U. S., at 769–770, and n. 18. In *Allen,* the

state trial court, like the District Court in this case, found that compelled payments to support BRAC's death benefit system were not reasonably necessary or related to collective bargaining and could not be charged to objecting employees. See 373 U. S., at 117. We found it unnecessary to reach the correctness of that conclusion.

Here, the Court of Appeals said that death benefits have historically played an important role in labor organizations, that insurance benefits are a mandatory subject of bargaining, and that by providing such benefits itself rather than seeking them from the employer, BRAC is in a better position to negotiate for additional benefits or higher wages. The court added that the "provision of a death benefits plan, which tends to strengthen the employee's ties to the union, is germane to the work of the union within the realm of collective bargaining." 685 F. 2d, at 1074. This was consistent with the affidavit of one of the union's expert witnesses to the effect that "death benefit funds do provide a desirable economic benefit to union members and, therefore, they do serve as an organizational aid and as a means of strengthening the union internally." Affidavit of Lloyd Ulman, 2 App. 210. Petitioners, of course, press the view that death benefits have no connection with collective bargaining at all, let alone one that would warrant forcing them to participate in the system.

We find it unnecessary to rule on this question. Because the union is no longer the exclusive bargaining agent and petitioners are no longer involved in the death benefits system, the only issue is whether petitioners are entitled to a refund of their past contributions. We think that they are not so entitled, even if they had the right to an injunction to prevent future collections from them for death benefits. Although they objected to the use of their funds to support the benefits plan, they remained entitled to the benefits of the plan as long as they paid their dues; they thus enjoyed a form of

insurance for which the union collected a premium.[14]  We doubt that the equities call for a refund of those payments.

## VI

Petitioners' primary argument is that for the union to compel their financial support of these six activities violates the First Amendment.  We need only address this contention with regard to the three activities for which, we have held, the RLA allows the union to use their contributions.  We perceive no constitutional barrier.

The First Amendment does limit the uses to which the union can put funds obtained from dissenting employees. See generally *Abood* v. *Detroit Board of Education,* 431 U. S. 209 (1977).  But by allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights.  The dissenting employee is forced to support financially an organization with whose principles and demands he may disagree.  "To be required to help finance the union as a collective-bargaining agent might well be thought . . . to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." *Id.,* at 222.  It has long been settled that such interference with First Amendment

---

[14] At oral argument, petitioners' counsel stated that at the time their complaints were filed, nonmembers were not in fact eligible for death benefits, even though their agency fees helped support the program.  Tr. of Oral Arg. 9.  In pretrial filings, petitioners relied on this as an example of the union's breach of its duty of fair representation.  See 2 Record, Doc. No. 75, p. 40.  The fair representation argument is not before us.  Nor is it clear from the record whether petitioners are correct as a factual matter. See 3 Record, Doc. No. 155, p. 47, n. 23 (defendants' memorandum in opposition to summary judgment).  We would have no hesitation in holding, however, that the union lacks authorization under the RLA to use nonmembers' fees for death benefits they cannot receive.  Section 2, Eleventh is based on the presumption that nonmembers benefit equally with members from the uses to which union money is put.

rights is justified by the governmental interest in industrial peace. *Ibid.; Street*, 367 U. S., at 776, 778 (Douglas, J., concurring); *Hanson*, 351 U. S., at 238. At a minimum, the union may constitutionally "expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining." *Railway Clerks* v. *Allen*, 373 U. S., at 122. The issue is whether these expenses involve additional interference with the First Amendment interests of objecting employees, and, if so, whether they are nonetheless adequately supported by a governmental interest.

Petitioners do not explicitly contend that union social activities implicate serious First Amendment interests. We need not determine whether contributing money to such affairs is an act triggering First Amendment protection. To the extent it is, the communicative content is not inherent in the act, but stems from the union's involvement in it. The objection is that these are *union* social hours. Therefore, the fact that the employee is forced to contribute does not increase the infringement of his First Amendment rights already resulting from the compelled contribution to the union. Petitioners may feel that their money is not being well-spent, but that does not mean they have a First Amendment complaint.

The First Amendment concerns with regard to publications and conventions are more serious; both have direct communicative content and involve the expression of ideas. Nonetheless, we perceive little additional infringement of First Amendment rights beyond that already accepted, and none that is not justified by the governmental interests behind the union shop itself. As the discussion of these expenses indicated, they "relat[e] to the work of the union in the realm of collective bargaining." *Hanson, supra,* at 235. The very nature of the free-rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in its use of compelled funds. "'The furtherance of the common cause leaves some leeway

for the leadership of the group.'" *Abood, supra,* at 221–222, quoting *Street, supra,* at 778 (Douglas, J., concurring). These expenses are well within the acceptable range.

## VII

The Court of Appeals erred in holding that respondents were entitled to charge petitioners for their pro rata share of the union's organizing and litigating expenses, and that the former rebate scheme adequately protected the objecting employees from the misuse of their contributions. The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.[15]

*It is so ordered.*

JUSTICE POWELL, concurring in part and dissenting in part.

I am in accord with Parts I, II, III, and IV of the Court's opinion, and with all of Part V except for Subdivision 1, which addresses the "convention" issue. I also do not agree with the Court's analysis in Part VI in which petitioners' First Amendment arguments are disposed of summarily.

---

[15] On remand, damages will have to recalculated. Petitioners argue that a new trial is required because the District Court applied a preponderance-of-the-evidence, rather than a clear-and-convincing, standard of proof. It is plain from the discussion of this issue in *Railway Clerks* v. *Allen,* 373 U. S. 113 (1963), in which we held that the union bears the burden of proving what proportion of expenditures went to activities that could be charged to dissenters, that no heightened standard is appropriate in this situation. We noted there that "[a]bsolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise." *Id.,* at 122. The fact that petitioners invoke the First Amendment is insufficient reason to impose the heightened standard on their opponents, and we perceive no need to abandon the preponderance standard normally applicable in civil suits for damages. See generally *Addington* v. *Texas,* 441 U. S. 418, 423–425 (1979).

I

For the most part, the Court's opinion considers whether the Railway Labor Act itself permits the respondent union to charge nonunion employees for the challenged expenditures. The First Amendment, upon which petitioners primarily rely, is not the basis for the Court's decision except to the extent this was addressed in Part VI. In light of prior decisions construing the Act, I agree with the Court's decision to dispose of most of petitioners' claims on statutory rather than constitutional grounds.

The relevant general principles, as the Court has shown, are well settled. *Railway Employees* v. *Hanson*, 351 U. S. 225 (1956); *Machinists* v. *Street*, 367 U. S. 740 (1961); *Railway Clerks* v. *Allen*, 373 U. S. 113 (1963). It is clear from these decisions that objecting nonunion employees may not properly be required to contribute to political causes with which they may disagree. No prior decision of this Court, however, has "define[d] the line between union expenditures that all employees must help defray and those that are not sufficiently related to collective bargaining to justify their being imposed on dissenters." *Ante,* at 447. The Court today adopts a statutory test or standard for identifying expenditures that fairly can be viewed as benefiting all employees:

> "[W]hen employees such as petitioners [in this case] object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Ante,* at 448.

This standard fairly reflects statutory intent and is reasonable. But like any general standard, reasonable people—and judges—may differ as to its application to particular types of expenditures. In this case, petitioners challenge six general categories of expenditures incurred by respondent

union (BRAC): the quadrennial conventions, litigation not involving the negotiation of agreements or settlement of grievances, union publications, social activities, death benefits for employees, and general organizing activities. As noted above, I concur in the Court's disposition of all of these categories except the quadrennial conventions of BRAC.

The Court, in a single paragraph, concludes that in view of the primary purposes of a national convention, it is appropriate for petitioners to "help defray the costs of these conventions." *Ante*, at 448. I agree that conventions are necessary to elect officers, to determine union policy with respect to major issues of collective bargaining, and generally to enable the national union to perform its essential functions as the exclusive bargaining representative of employees. But it is not seriously questioned that conventions also afford opportunities—that often are fully exploited—to further political objectives of unions generally and of the particular union in convention.

The District Court's findings in this case were based on the record with respect to the 25th quadrennial convention of BRAC. Its cost to the union was approximately $1,802,000. The minutes of the convention indicate that a number of major addresses were made by prominent politicians, including Senators Humphrey, Kennedy, Hartke, and Schweiker, the Mayor of Washington, D. C., and four Congressmen. The union has not shown how this major participation of politicians contributed even remotely to collective bargaining. Before a union may compel dissenting employees to defray the cost of union expenses, it must meet its burden of showing that those expenses were "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive [collective-bargaining] representative." *Ante*, at 448. See *Railway Clerks* v. *Allen*, 373 U. S., at 122.[1] Appar-

---

[1] Respondents' brief emphasizes the purposes and activities of these quadrennial conventions that do relate—even though sometimes tangentially—to collective bargaining. Respondents' brief deals only lightly with political speeches and activities. It does say that the "appearances of the

ently no effort was made by the union in this case to identify expenses fairly attributable to these and other political activities, and to make appropriate deductions from the dues of objecting employees. I do not suggest that such an allocation can be made with mathematical exactitude. But reasonable estimates surely could have been made. See *ibid.* The union properly felt a responsibility to allocate expenses where political material was carried in union publications. See *ante,* at 450–451.

In view of the foregoing, I do not understand how the Court can make the judgment today that all the expenses of the 25th quadrennial meeting of BRAC qualify under the Court's new standard as "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive [collective-bargaining] representative." I, therefore, would reverse the Court of Appeals on this issue, and remand the case for further consideration in light of the standard articulated by the Court.

## II

In Part VI the Court found it necessary to address petitioners' First Amendment argument with respect to three of the six activities at issue: social affairs, publications, and con-

---

Mayor of Washington and the other public officials created no additional costs to BRAC," and "if there had been such costs [such as paying honoraria] those costs would have been deducted from [the dues of] objecting employees." Brief for Respondents 29, n. 16. This brief explanation leaves a number of unanswered questions. For example, the record does not appear to reveal who defrayed the travel, hotel, and other expenses of speakers and their staff who made political speeches or whose purpose in attending was to further political causes. Nor does the record show who paid for the considerable entertaining that likely was provided for speakers as distinguished as those mentioned above. This may or may not fairly be considered an appropriate expense under the Court's standard. In short, at least for me, it does not seem appropriate for this Court—on the record before us—to assume that *all* union activities were disassociated from political causes. The case should be remanded for a full development of these facts.

ventions. The reasoning of the Court is not clear to me. It agrees, as it must, that the First Amendment "does limit the uses to which the union can put funds obtained from dissenting employees," *ante,* at 455 (citing *Abood* v. *Detroit Board of Education,* 431 U. S. 209 (1977)). Nevertheless, the Court's conclusion with respect to convention expenses appears to ignore that constraint.

In Part I above, I have expressed my disagreement with the Court's apparent determination that the Railway Labor Act permits the use of compulsory dues to help defray the costs of political activities incurred at the quadrennial conventions. Under that interpretation of the Act, it would be unnecessary to reach the constitutional question in this case. Even if Congress had intended the Act to permit such use of compulsory dues, it is clear that the First Amendment would not. Where funds are used to further political causes with which nonmembers may disagree, the decisions of this Court are explicit that nonmember employees may not be compelled to bear such expenditures. The Court's conclusory disposition of petitioners' argument ignores the force of these decisions. See *Abood, supra,* at 234; *Street,* 367 U. S., at 777–778 (Douglas, J., concurring).[2]

These same concerns would prohibit the union, as a constitutional matter, from charging dissenting employees for publication expenses related to political causes. Because the Court has determined that the Act prohibits the union from charging dissenting employees for publication expenses unrelated to collective bargaining, *ante,* at 451, I assume that the First Amendment discussion in Part VI applies only to publication expenses directly related to collective bargaining.

---

[2] In *Abood,* the Court observed:

"[The dissenting employees] specifically argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one." 431 U. S., at 234.

462

Thus, I concur in Part VI of the Court's opinion only to the extent it holds that the First Amendment does not bar those publication expenses "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive [collective-bargaining] representative." [3]

### III

For the reasons stated above, I join Parts I, II, III, IV, and all but Subdivision 1 of Part V. As to the convention issue addressed in that subdivision, I believe that the judgment should be reversed and the case remanded to the Court of Appeals for further consideration in light of the test articulated today by the Court. In view of my position on that issue, I do not think it necessary to reach the First Amendment issue as to conventions; nor do I agree with the Court's summary conclusion that no First Amendment rights are implicated by the expenditure of funds on political causes at conventions. I, therefore, dissent from the Court's decision in Part V, Subdivision 1, and from its decision with respect to conventions found in Part VI. I concur in the remainder of the result reached in Part VI.

---

[3] With respect to "social activities," I concur only in the result reached by the Court's First Amendment analysis. As the Court points out, the expenditures on such activities are *"de minimis,"* and petitioners do not contend that the social activities here "implicate serious First Amendment interests." *Ante,* at 456. Within reasonable limits, I think it fairly may be argued that social occasions are related to the duties of the union as the exclusive representative of all of the employees in the bargaining unit. The fraternal aspect of a union may be relevant to its bargaining capability, and this Court has held that the First Amendment permits the union to "expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining." *Railway Clerks* v. *Allen,* 373 U. S. 113, 122 (1963).