CAL–ALMOND INC.; Gold Hills Nut Company Inc.; Frazier Nut Farms Inc.; Bal Nut Inc.; Central Valley Grower Packing; Hocker Nut Farm; Jardine Organic Ranch; Rotteveel Orchards; Theron Shamochian Inc.; Beards Quality Nut Co.; Amaretto Orchards; Carlson Farms, Plaintiffs–Appellants,

v.

U.S. DEPARTMENT OF AGRICULTURE, Defendant–Appellee.

No. 98–16921.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1999.

Decided Sept. 21, 1999.

Brian C. Leighton (argued), Clovis, California, for the plaintiffs-appellants.

Daniel Bensing (argued), United States Department of Justice, Washington, D.C., for the defendant-appellee.

Before: REINHARDT, O'SCANNLAIN and W. FLETCHER, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether an almond marketing order violates the First Amendment by imposing mandatory assessments on individual almond handlers to fund collective generic almond promotion.

I

Cal–Almond, Inc., et al. (collectively "Cal–Almond"), are almond handlers subject to an almond marketing order ("Almond Order") issued by the United States Department of Agriculture ("USDA") pursuant to the Agricultural Marketing Agreement Act, 7 U.S.C. §§ 601 *et seq.* ("Act"). The Almond Order imposes assessments upon handlers based on the tonnage of almonds handled, and a substantial portion of the assessments is used to fund generic advertising, promotion, and marketing of almonds. The Almond Order affords almond handlers the option of directly advertising their own products in certain specified ways, for which they can receive credit against their assessments. More specifically, credit can be received for promotional activities, such as advertising directed at "end users, trade or industrial users," 7 C.F.R. § 981.441(e)(4)(i), so long as "[t]he clear and evident purpose of each activity shall be to promote the sale, consumption or use of California almonds," *id.* § 981.441(e)(2). Prior to the 1993–94 crop year, handlers could receive 100% credit for their own direct advertising pursuant to the "creditable" advertising program. Beginning with the 1993–94 crop year, handlers could receive only two-thirds credit for their own direct advertising pursuant to the "credit-back" advertising program. *See id.* § 981.441(a).

Cal–Almond filed an administrative petition with the USDA alleging that the creditable and credit-back advertising programs violated its First Amendment rights. The ALJ upheld Cal–Almond's First Amendment challenge to the advertising programs, relying on our decision in *Cal–Almond, Inc. v. U.S. Dept. of Agriculture,* 14 F.3d 429 (9th Cir.1993) ("*Cal–Almond I* "), which held that the creditable almond advertising program constituted compelled speech that violated the almond handler's First Amendment rights, *see id.* at 440. Both parties appealed the ALJ's decision to the USDA's judicial officer, who stayed the proceedings pending the

Supreme Court's decision in *Glickman v. Wileman Brothers & Elliott, Inc.*, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) ("*Wileman*").

In *Wileman*, the Court upheld mandatory assessments for generic advertising of California tree fruits as "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." *Id.*, 521 U.S. at 477, 117 S.Ct. 2130. In turn, the Supreme Court granted certiorari in *Cal–Almond I*, vacated this court's decision, and remanded for reconsideration in light of *Wileman. See Dept. of Agriculture v. Cal–Almond, Inc.*, 521 U.S. 1113, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997) ("*Cal–Almond II* "). We, in turn, remanded *Cal–Almond I* to the district court with instructions to dismiss the First Amendment challenges to the advertising programs, citing *Wileman. See Cal–Almond, Inc. v. Dept. of Agriculture*, No. 94–17160 (9th Cir. Sept. 4, 1997) ("*Cal–Almond III* ").

In light of the Supreme Court's decision in *Wileman* and *Cal–Almond II*, and our remand for dismissal in *Cal–Almond III*, the USDA's judicial officer reversed the ALJ's decision in this case and held that *Wileman* foreclosed Cal–Almond's First Amendment claims. Cal–Almond sought review in the United States District Court for the Eastern District of California, which also held that Cal–Almond's claims were foreclosed by *Wileman*. Cal–Almond subsequently brought this appeal.

## II

Cal–Almond asserts that the *Wileman* analysis does not apply here because the Supreme Court considered the constitutional validity of purely mandatory assessments for generic advertising, while this case concerns the constitutional validity of assessments for generic advertising that are not purely mandatory because credit against the assessments is provided for certain forms of branded advertising. In *Gallo Cattle Co. v. California Milk Adviso-*ry Bd., 185 F.3d 969 (9th Cir.1999) ("*Gallo* "), we explained that, in order "[t]o determine whether *Wileman* is dispositive of the claims asserted by [a party], we will go through the same analytical steps that the Court used in *Wileman*." *Id.* at 974 (applying *Wileman* analysis and rejecting First Amendment challenge to mandatory assessments imposed under dairy promotion program that included generic and branded advertising). Thus, in order to determine whether *Wileman* is dispositive here, we must again go through the *Wileman* analytical steps.

Following *Gallo* 's lead, we first examine the statutory scheme under which the mandatory assessments for almond marketing were imposed to determine whether constraints have been placed upon the handlers' independent action. *See id.* at 974. After assessing the statutory context, we proceed to *Wileman* 's tripartite test, which determines whether the creditable and credit-back advertising programs abridge Cal–Almond's First Amendment rights, or are "instead part of a 'regulatory scheme' subject to review only as an economic regulation." *Id.* We must consider (1) whether the advertising programs impose a restraint on Cal–Almond's freedom to communicate any message to any audience; (2) whether the advertising programs compel Cal–Almond to engage in any actual or symbolic speech; and (3) whether the advertising programs compel Cal–Almond to endorse or finance any political or ideological views that are not germane to the purposes for which the compelled association is justified. *See id.*

## A

The Act confers on the Secretary of Agriculture the power "to establish and maintain [ ] orderly marketing conditions for agricultural commodities." 7 U.S.C. § 602(1). Pursuant to this mandate, the Secretary is empowered to "[e]stablish or provid[e] for the establishment of production research, marketing research and

development projects designed to assist, improve, or promote the marketing, distribution, and consumption or efficient production of" almonds, among other commodities. *See id.* § 608c(6)(I). Thus, as in *Gallo* and *Wileman,* it would appear that the almond handlers are "part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme," *id.,* 521 U.S. at 469, 117 S.Ct. 2130, nor, indeed, does Cal–Almond dispute in its briefs on appeal whether handlers are so regulated.

### B

Cal–Almond asserts that the assessments imposed under the Almond Order restrict its freedom to communicate by limiting the money that it has for advertising; most of Cal–Almond's other objections to the creditable and credit-back advertising programs also boil down to the impact that the assessments imposed under those programs have on its advertising budget. Cal–Almond effectively concedes that purely mandatory assessments would be constitutional under *Wileman,* but asserts that the credit option renders the assessments here unconstitutional. Cal–Almond contends that because it is less likely to receive credit for advertising that suits its purposes, its advertising budget is limited as compared to its competitors.

In *Gallo,* however, we expressly rejected the argument that a decrease in a producer's advertising budget constitutes a limitation on speech, stating that "although the assessments made under the Marketing Order may, as Gallo argues, 'substantially reduce the amount of money Gallo has to spend on its own advertising used to distinguish its own product,' this 'incidental effect of constraining the size of [Gallo's] advertising budget' does not itself amount to a restriction on speech." *Id.* at 975. This portion of our holding in *Gallo* followed necessarily from *Wileman,* wherein the Supreme Court made plain that "[t]he fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech." 521 U.S. at 470, 117 S.Ct. 2130.

The Almond Order does not impose a restraint on Cal–Almond's freedom to communicate because Cal–Almond remains "free to advertise or otherwise communicate any message that it desires in any manner that it desires to any audience that it desires." *Gallo,* 185 F.3d at 975. Cal–Almond's assertion that the credit programs have a disparate impact upon the various handlers' advertising budgets is not relevant to the *Wileman* analysis. As the Supreme Court made plain:

> Similar criticisms might be directed at other features of the regulatory orders that impose restraints on competition that arguably disadvantage particular producers for the benefit of the entire market. Although one may indeed question the wisdom of such a program, its debatable features are insufficient to warrant special First Amendment scrutiny.

*Wileman,* 521 U.S. at 474, 117 S.Ct. 2130.

### C

Cal–Almond asserts that the creditable and credit-back programs compel speech because the Almond Board dictates how individual handlers must conduct their direct advertising if they wish to receive credit against their assessments. We are not persuaded, however. Because almond handlers remain free to choose whether and how to advertise directly, it cannot be said to constitute compelled speech. Handlers can decline to advertise directly and simply pay their assessments. They can directly advertise in an attempt to receive credit against their assessments. Or, they can directly advertise regardless of whether they will receive credit. *Cf. Gallo,* 185 F.3d at 975 (holding that the requirement that producers display promotional seal in order to fully benefit from generic advertising campaign did not constitute compelled speech because producers remained

"free to choose not to carry the seal"). Rather than supporting Cal–Almond's assertion that *Wileman* is distinguishable, the flexibility provided by the creditable and credit-back programs instead supports the conclusion that the assessments here are indeed constitutional.

The program upheld in *Wileman* imposed purely mandatory assessments and therefore provided little recourse to those producers who objected to the messages disseminated, questioned the wisdom of the way the assessments were spent, or doubted the efficacy of generic advertising. By contrast, the programs here potentially accommodate objectors: handlers who object to generic advertising or believe there is a more cost-effective means of promoting almonds have the option of performing their own direct advertising for which they may receive credit against their assessments. Thus, the creditable and credit-back programs potentially limit the extent to which almond handlers must fund advertising to which they object, and if the handlers cannot receive credit for their preferred form of direct advertising, they can simply pay the assessments and will be no worse off than the producers in *Wileman.*

### D

Cal–Almond attempts to distinguish *Wileman* based on its objection to the messages funded by the assessments and the messages for which credit may be received. As *Gallo* makes plain, however, regardless of whether Cal–Almond has legitimate ideological objections to those messages, those objections do not render the advertisements compelled speech in violation of the First Amendment so long as the messages are germane to the purposes of the Almond Order and the Act. *See id.,* 185 F.3d at 975. Here, there can be no dispute that messages, generic or branded, promoting almond sales are germane to the Almond Order's and the Act's purpose, which is "to assist, improve, or promote the marketing, distribution, and consumption" of almonds. 7 U.S.C. § 608c(6)(I); *cf. Wileman,* 521 U.S. at 476, 117 S.Ct. 2130 ("Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market. That purpose is legitimate and consistent with the regulatory goals of the overall statutory scheme."); *Gallo,* 185 F.3d at 976 ("The [ ] employment of a generic advertising campaign of California Milk and dairy products ... is obviously 'germane' to [the California dairy marketing order's] purposes.").

Moreover, at base, Cal–Almond's objections to the advertising programs and the assessments imposed thereunder do not appear to be ideological or "to engender any crisis of conscience." *Wileman,* 521 U.S. at 472, 117 S.Ct. 2130. Instead, Cal–Almond questions the effectiveness of the advertising programs and the messages funded by the assessments. More specifically, Cal–Almond objects to the Almond Board's generic advertising for snack almonds, because Cal–Almond does not sell snack almonds. *Wileman,* however, makes plain that such challenges to the wisdom or effectiveness of a promotional program raise questions of economic policy, rather than questions of constitutional import:

> Neither the fact that respondents may prefer to foster [a] message independently in order to promote and distinguish their own products, nor the fact that they think more or less money should be spent fostering it, makes this case comparable to those in which an objection rested on political or ideological disagreement with the content of the message. The mere fact that objectors believe their money is not being well spent "does not mean [that] they have a First Amendment complaint."

*Id.* (quoting *Ellis v. Railway Clerks,* 466 U.S. 435, 456, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)).

Cal–Almond also objects to the provision of credit against the assessments for branded direct advertising. In *Gallo,* we

were presented with a similar objection to the use of assessments to fund promotional activities that were not generic, but rather branded, and thus promoted certain brands to the exclusion of others. Following *Wileman,* we rejected the objection as irrelevant to the constitutionality of the advertising program, stating that "[t]his claim, 'while perhaps calling into question the administration of portions of the program, [has] no bearing on the validity of the entire program.'" *Gallo,* 185 F.3d at 976 n. 9 (quoting *Wileman,* 521 U.S. at 468, 117 S.Ct. 2130).

Similarly here, Cal–Almond's objections have no bearing on the constitutionality of the creditable and credit-back programs, but rather, call into question the administration of those programs. Because those programs do not compel speech or the endorsement of non-germane messages, leaving Cal–Almond free to advertise however it desires, the Almond Order is "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." *Wileman,* 521 U.S. at 477, 117 S.Ct. 2130.

### III

Lastly, Cal–Almond asserts that *Cal–Almond I* is dispositive. However, in light of the Supreme Court's remand in *Cal–Almond II* and our subsequent remand for dismissal in *Cal–Almond III, Cal–Almond I* has been implicitly overruled.

### IV

For the foregoing reasons, the Almond Order does not abridge Cal–Almond's First Amendment rights.

AFFIRMED.