**Thomas W. CARROLL, et al., Plaintiffs,**

v.

**Donald M. BLINKEN, et al., Defendants.**

**No. 83 Civ. 1272 (RO).**

United States District Court,
S.D. New York.

July 30, 1991.

Atlantic Legal Foundation, Inc. (Martin S. Kaufman, of counsel), and Milbank, Tweed, Hadley & McCloy, (Andrew Citron, of counsel), New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y. (Andrea Green, of counsel), New York City and State University of New York, Office of University Counsel (Gerianne Jordan, of counsel), Albany, N.Y., for state defendants.

Fried, Frank, Harris, Shriver & Jacobson (Alexander R. Sussman, Karen L. Morris and Laurence E. Wiseman, of counsel), and New York Lawyers for the Public Interest (Marla G. Simpson, of counsel), New York City, for defendant NYPIRG.

## OPINION AND ORDER

OWEN, District Judge

■ This action was tried before me without a jury over six days in October and November 1989. Plaintiff, a student at the New York State University at Albany,[1] attacks as unconstitutional the allocation to the New York Public Interest Research Group ("NYPIRG"), of $3 from his $53 mandatory student activity fee payable each semester.[2] The total $53 fee funds a great number of student activities which, having first met SUNY's criteria under regulations adopted pursuant to New York's Education Law § 355,[3] are then voted on by the Student Association and must thereafter be approved and certified by the President of the University. Under the foregoing, a wide array of student groups receive funding including sporting clubs, language clubs, the Black Alliance, the Revisionist Zionist Alternative, the Feminist Alliance, the Pan–Caribbean Association, Fuerza Latina, the Gay and Lesbian Alliance, and the Student Association of the State University.

NYPIRG,[4] which receives the questioned $3, is a New York not-for-profit corporation in whose activities some nineteen New York State University campuses participate and from whose campuses its Board of Directors—all students—come by student election. NYPIRG provides an opportunity for students to gain experience in citizenship and advocacy skills through research and active participation in public policy is-

1. After the trial was concluded, but before an opinion had been rendered, defendants moved to dismiss on the ground that the action had become moot because plaintiff Michael McChesney, who at the time of trial had been a student in good standing at SUNY Albany, had subsequently been academically dismissed. According to SUNY Albany policy, a student who has been dismissed for academic reasons can apply for reinstatement at any time. Although McChesney has not yet applied for readmission, he may choose to do so, and it is reasonable to expect that he would then again raise the same claim which was fully litigated in the trial before me. Thus, I find that this claim is "capable of repetition yet evading review," *Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988); *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (1982), and is not moot.

In addition to McChesney, Thomas Carroll, Robert Carroll, Craig Rucker, Emanuel Panos, Beth Turkovic, Edward Priola and Robert Schmidlin, former students at SUNY Albany who graduated before trial, are also named as plaintiffs and seek damages. The trial was bifurcated and only the injunctive claims of McChesney were tried. Plaintiff now moves to add three new plaintiffs, Christine McClellan, Christopher Sandor and Susanne Zeigler, all of whom are currently undergraduates at SUNY Albany and all of whom seek to raise the same core issue raised by McChesney and tried by this Court. Because these parties assert a right to relief arising out of the same transaction or occurrence out of which McChesney sues and involve the same questions of law and fact, plaintiff's request is granted. Fed.R.Civ.P. 20.

The named SUNY defendants are Donald Blinken in his capacity as Chairman of the Board of Trustees of the State University of New York; the individual members of the SUNY Board of Trustees in their capacity as trustees; D. Bruce Johnstone in his capacity as Chancellor of SUNY; and Vincent O'Leary in his capacity as President of SUNY Albany. Certain of the original named defendants who were sued in their official capacities ceased to hold office during the pendency of this action and have been succeeded by the current incumbent trustees and administrative officers of SUNY, pursuant to Fed.R.Civ.P. 25(d).

2. If the students approve payment of the student activity fee on a mandatory basis, every student is required to pay the fee for each term he or she is registered; failure to pay the mandatory student activity fee may result in denial of registration, unless it is determined that payment of the fee may cause a particular student undue hardship. § 302.14(c). During the relevant period, the SUNY Albany undergraduate student body voted to collect the student activity fee on a mandatory basis.

3. The regulation, 8 N.Y.C.R.R. § 302.14, requires that the allocations benefit the campus community and are consistent with the following criteria:
    (i) programs of cultural and educational enrichment;
    (ii) recreational and social activities;
    (iii) tutorial programs;
    (iv) athletic programs, both intramural and intercollegiate;
    (v) student publications and other media;
    (vi) assistance to recognized student organizations, provided that the purpose and activities of the organization are of educational, cultural, recreational or social nature; ...

4. NYPIRG is unusual in one respect in that since it involves other campuses, it is specifically voted upon by the student body at large of SUNY Albany every four years. It has always been approved.

sues. It endeavors to identify and evaluate issues involving public decisions in New York State, conducts research on such issues, makes recommendations for public action, provides representation before governmental agencies, and seeks to promote reform through legislative and legal action. NYPIRG does not endorse or support campaigns for elective office. It operates through local chapters on the campuses of those State Universities which participate. NYPIRG's Board of Directors and its officers are all students, elected from the campuses at which a local NYPIRG chapter is a student organization and receives activity fee funding. Any activity fee-paying student at such a campus is eligible to run for election to the NYPIRG Board of Directors. In recent years, one or more students from SUNY Albany have been elected and served on the NYPIRG Board. Some students, participating in NYPIRG's activities, earn academic credit for their work; others participate in the activities on a volunteer basis. In addition to those students actively involved in organizing these various NYPIRG programs, others serve the student body by promoting speeches, debates, public forums, film shows, a used-book exchange service, newspaper recycling centers, conservation tips, and consumer service handbooks. SUNY Albany has had students who participated in a small claims court assistance clinic through which the students assisted community residents in court. Students at SUNY Albany have conducted surveys on the drinking age, proposed tuition hikes, comparative prices of various products at area supermarkets, services available to rape victims, local beverage stores' compliance with the bottle return law, and local drug stores' compliance with generic drug legislation. They have prepared and disseminated reports on local bank practices and services, and local taxicab overcharge problems. They formed a project to improve campus lighting and other safety features. Other NYPIRG projects on which students from SUNY Albany work include research on the impact of toxic waste dumping, along with efforts to identify and clean up local sites near the campuses; voter registration drives; research and advocacy efforts concerning food irradiation; and research and advocacy efforts directed at government accountability and ethics. Students have researched issues including the statute of limitations in toxic exposure cases, the state's policy regarding its holdings in banks or companies doing business in South Africa, the transportation of nuclear waste, the rising costs of local utilities, the shortage of high-quality child care, the pending reauthorization of federal higher education costs, higher education financial aid programs, and various proposals to raise SUNY tuition, and the escalation of the arms race, all of which issues became the subject of NYPIRG-sponsored speeches, public forums and/or public debates on the public SUNY campus.

Each of these projects is selected annually by the NYPIRG Board of Directors, which, as observed earlier, consists wholly of students from the many local chapters throughout the state. Continuing projects are subject to annual reauthorization. In addition, any fee-paying student at a campus may advocate a proposal for a new project and submit it to the student Board of Directors for approval at any time. Each year the NYPIRG board specifically reviews and adopts a legislative program for the up-coming legislative session. The local and statewide projects and activities approved by the NYPIRG board involve students in numerous research, advocacy and public service matters of concern at the Albany campus. Participating students in each area learn about their chosen project; prepare reports, memoranda and press releases; practice public survey techniques; involve themselves in community service efforts; obtain experience in public speaking; sponsor debates; and communicate with their legislative representatives.

It is clear from the testimony at the trial, whether the witness was the college president or a NYPIRG board member, that this experiential opportunity is regarded as a substantial educational benefit to students at SUNY Albany, and indeed, such would appear to be self-evident. On each campus, NYPIRG employs a legislative director.

The director's responsibility at SUNY Albany, for example, is to train students in speaking, writing, research, organization and advocacy skills as well as exploring and advocating new project areas. Instruction in these projects is not only supervised by the campus directors, but also by NYPIRG's executive director, its student Board of Directors and its executive committee. The project creativity staff overseeing this operation is located in two statewide support offices, one in New York City and one in Albany. These offices and the campuses have some 60 paid full-time non-student staff,[5] who receive approximately 54% of NYPIRG's annual budget of around $2.7 million. Approximately 30% of this money comes from student activity fees, 45% from door-to-door canvassing, 15% from commissions on NYPIRG's fuel buyers groups, and 10% from grants.

Through the student activity fee, SUNY Albany, as has been pointed out, funds a wide array of student groups and has created a diverse forum for public discussion and debate on issues that affect our country. College campuses should, can and do play a vital role in promoting such debate and training undergraduates to become concerned, involved public citizens. By allocating a portion of the student activity fee to NYPIRG, SUNY Albany creates an opportunity for those students who so choose,[6] to enhance their civic awareness and skills. Simultaneously, by allocating funds to *other* student organizations, SUNY Albany encourages those students who do not choose to join NYPIRG to develop other skills or engage in activities which focus on other issues. The SUNY

Albany administrators have determined that NYPIRG provides substantial educational opportunities for students, consistent with the criteria laid out in the State regulations, and that conclusion is well supported by the record.

Plaintiff argues that NYPIRG is a political action group[7] with only an incidental educational component and that the decision by the SUNY Albany trustees and administrators to permit funding of NYPIRG from the mandatory student activity fee is not primarily or genuinely an academic decision. Testimony at trial belies plaintiff's claim. The fact that some of NYPIRG's activities involve issues of public policy does not diminish its educational value. The educational value lies in the participatory civics training obtained by the students who take advantage of this opportunity. The SUNY Albany administrators, having determined that a valuable part of an undergraduate education is gained through direct "hands on" involvement in civic activities, that determination is entitled to deference. *See Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 513–14, 88 L.Ed.2d 523 (1985); *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759–60, 57 L.Ed.2d 750 (1978); *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 263, 77 S.Ct. 1203, 1211–12, 1218, 1 L.Ed.2d 1311 (1957). This determination is the type of academic decision that is best left to administrators and trustees with expertise in designing college and universi-

---

**5.** NYPIRG's publication "Agenda for Citizen Involvement" states their purpose as follows:

NYPIRG's professional staff works to shape public policy and develop citizenship skills in the areas of consumer protection, government and corporate accountability, and economic and social justice. Some 15 of these are registered lobbyists who, among other things, lobby state legislators and governmental officials sometimes in company with and sometimes not, but only on behalf of positions taken by NYPIRG's student Board of Directors. NYPIRG's Board of Directors annually fashions a "Legislative Program."

**6.** At SUNY Albany alone, some 60 students are regularly active at all times and some have been

involved as legislative interns and directors. As observed, SUNY–Albany is but one of nineteen participating universities in New York State.

**7.** Plaintiff obviously disagrees with some of the positions taken by his fellow undergraduates, but he is at liberty to participate in the annual decision-making (see below) and urge positions *he* wishes to espouse for an upcoming year. Thus, NYPIRG should be viewed not for the positions it in fact takes but—as the administration sees it—for the opportunity it gives students to take positions and then gain experience in pressing for them.

ty curriculum and extra-curricular activities.

Moreover, the freedom of the University to determine its educational mission, consistent with the professional judgment of those who guide it, is itself an interest which the First Amendment protects, particularly when that determination fosters debate on public issues. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964). College campuses play a central role in providing an open forum for debate. *See, Widmar v. Vincent*, 454 U.S. 263, 267–68 n. 5, 102 S.Ct. 269, 273–74 n. 5, 70 L.Ed.2d 440 (1981); *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266 (1972) ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas' "). By funding over 100 diverse student organizations, SUNY has established such a forum.

In analyzing plaintiff's First Amendment claim, plaintiff's individual interest in wishing not to contribute a portion of his mandatory fee to NYPIRG must be balanced against the University's interest in providing all students with the opportunity to engage in a wide range of activities and creating a forum for discussion. In addition to plaintiff's interests, one must consider the rights of the large number of students who voted for, participate in, and support NYPIRG, as well as the right of the student body as a whole to receive information through the exchange of ideas. Where the State spends money to expand public debate, and does so on a content neutral basis,[8] the Constitution does not provide those individuals contributing to State funds control over the allocation of their contribution. *Buckley v. Valeo*, 424 U.S. 1, 92–93, 96 S.Ct. 612, 669–70, 46 L.Ed.2d 659 (1976). Plaintiff's payment of the student activity fee, just like taxpayers' contributions to the government's general funds, may permissibly be used to fund political action and speech, despite some

individuals' opposition to the views espoused through such action. *See Buckley* at 92–93, 96 S.Ct. at 669–70; *Regan v. Taxation with Representation*, 461 U.S. 540, 548, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983).

In order to establish a First Amendment claim of compelled speech or association, plaintiff must demonstrate a close association between himself and the political speech with which he disagrees. *See West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986). Absent a close identification, no First Amendment interest is implicated. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 87, 100 S.Ct. 2035, 2044, 64 L.Ed.2d 741 (1980); *Widmar v. Vincent*, 454 U.S. 263, 274, 102 S.Ct. 269, 276–77, 70 L.Ed.2d 440 (1981). In *Barnette*, the Court struck down a school requirement compelling students to stand up and recite the pledge of allegiance. In *Wooley*, the Court found unconstitutional a state statute requiring an individual to publicly display a license plate motto that offended his religious beliefs. In *Pacific Gas & Electric*, the Court prohibited a requirement that the utility company include political messages with which it disagreed in its billing envelopes. In each of these cases the objecting party was required to personally speak or carry a banner with which he disagreed. The connection between the objecting party and the objectionable speech was extremely close. In contrast, the SUNY Albany student who disagrees with a NYPIRG position is not himself compelled to speak out and voice NYPIRG's views, rather he is required only to contribute a fee to a general fund, out of which NYPIRG is but one group that is funded.[9] The connection be-

---

8. The University funds a wide range of organizations without considering what the groups' positions are on particular issues. NYPIRG, itself, exists to afford student the opportunity to *take* positions, whatever they may be. NYPIRG

does not present students with fixed positions that the students must accept.

9. The fact that NYPIRG erroneously states in certain of its materials that it represents *all*

tween plaintiff and any one view or organization funded by the activity fee is attenuated. The fee supports over 100 diverse groups, and the contributions of the fee are paid by several thousand students. Thus, no close association exists between plaintiff and NYPIRG, and plaintiff's First Amendment rights are not infringed.[10]

In addition to the concern that an individual may be forced to utter an opinion with which he disagrees, compelled speech cases also raise the concern that an individual who wishes to remain silent may be forced to speak in order to counter a view with which he is unwillingly associated. For example, in *Pacific Gas & Electric*, the Court held that the obligation to include within its envelope a message with which the company disagreed constituted such a high degree of identification that the utility company might feel obliged to respond to the positions with which it disagreed in order to distance itself from those views. In contrast, because the activity fee is paid by thousands of students and supports over one hundred diverse groups, no risk arises that plaintiff will feel compelled to respond to the views of NYPIRG by presenting counter viewpoints. If plaintiff is truly troubled he may obtain on demand a writing from NYPIRG making explicit his disassociation. Indeed, counter viewpoints are already present in the forum, espoused by those groups which do not share NYPIRG's positions. Plaintiff is free to remain silent and let others speak on the various sides of an issue or, alternatively, plaintiff may choose to join one of these other organizations. Yet another option available to plaintiff is to join NYPIRG himself and vote for it to take a stand on an issue which satisfies him.

This case is also distinguishable from *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and its progeny, including *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 466 U.S. 435, 104 S.Ct.

1883, 80 L.Ed.2d 428 (1984), *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), and the recent *Lechnert v. Ferris Faculty Association*, —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), upon which plaintiff relies. These cases address compulsory payments to unions where the funds are used in part to support political speech or action with which the objectors disagree. In the *Abood* line of cases, the Supreme Court permits mandatory payments to unions so long as those payments go toward activities related to the collective bargaining process—even if objectors disagree with those activities. However, the Court disallows the use of mandatory fees to support activities that are unrelated to the union's collective bargaining functions. The union cases are distinguishable from the present case for two principal reasons. First, in the union context, fees are paid to only one source—the union—which claims to speak in behalf of all the employees; a dissenting employee has no other mouthpiece through which he may make his opinion heard. In contrast, as stated above, on the SUNY Albany campus, the activity fee funds a forum created for the purpose of fostering the expression of diverse views through a wide range of groups, and plaintiff is not directly associated with NYPIRG or any other single group with which he disagrees. Secondly, in the union cases, dues may permissibly be used only to fund activities which form the core purpose of the union, namely collective bargaining. Here, the student activity fee is being used by SUNY Albany precisely to further the University's core educational purpose of maintaining a broad extracurricular program and an open forum for discussion and debate. *See Kania v. Fordham*, 702 F.2d 475, 480 (4th Cir.1983).

Plaintiffs also cite *Galda v. Rutgers*, 772 F.2d 1060 (3d Cir.1985), *cert. denied*, 475 U.S. 1065, 106 S.Ct. 1375, 89 L.Ed.2d 602 (1986), in which the Third Circuit struck

students on its participating campuses, is not determinative on this issue.

10. On plaintiff's theory, a student could unilaterally reduce his contribution to the student

activity fund by a pro-rata deduction after determining all the organizations with whose goals he or she disagrees.

down Rutgers' *separate* mandatory fee used to support the New Jersey Public Interest Research Group (NJPIRG). However, in *Galda*, the Court limited its analysis, stating, "We are not concerned here with the question whether an organization with PIRG's philosophic outlook may be funded through the general activities fund as are other campus organizations representing diverse views." 772 F.2d at 1064. This, slender though it is, distinguishes that case from the one before me, and I feel more applicable here is Judge Adams' dissent, in which he states that "the justification for compelling student fees in a university setting is found in the First Amendment itself, which protects a university's right to educate, and students' rights to be educated by exposure to diverse ideological viewpoints." 772 F.2d at 1073 n. 7. Plaintiff, arguing the "least intrusive means" position, contends that the same civic training could be obtained by a student from fora and community activities operating locally and separately on each of the campuses involved. But obviously, none of these efforts could be as effective if NYPIRG worked only as a single-campus organization rather than, as currently constituted, with branches on several different campuses. Further, the experience gained by the students could not possibly be as meaningful, if the students merely engaged in play-acting, rather than becoming involved in actual research and advocacy efforts on real issues of public concern.

Accordingly, for the reasons stated above, I find that SUNY Albany's funding of NYPIRG through the allocation to it of $3 from plaintiff's mandatory student activity fee does not impermissibly infringe upon plaintiff's First Amendment rights. Plaintiff's claim for injunctive relief is accordingly denied and the action is dismissed. The foregoing constitutes the Court's findings of fact and conclusions of law and is so ordered.