Thomas W. CARROLL, Robert J. Carroll, Michael E. McChesney, Emanuel J. Panos, Edward J. Priola, Craig J. Rucker, Robert T. Schmidlin, Beth Turkovic Garfunkel, Christine McClellan, Christopher Sandor and Susanne Ziegler, Plaintiffs–Appellants,

v.

Donald M. BLINKEN, in his capacity as Chairman of the Board of Trustees of the State University of New York, George L. Collins, Jr., D. Clinton Dominick, Judith Lasher Duken, Arnold B. Gardner, Gurstin D. Goldin, John L.S. Holloman, Jr., Nan Johnson, Everette Joseph, Judith Davidson Moyers, Edward V. Mele, Victor Marrero, Rosemary Salomone, Edgar A. Sandman, Thomas Vanarsdale, Darwin R. Wales, in their capacities as trustees of the State University of New York, Jerome Komisar, in his capacity as Acting Chancellor of the State University of New York, Vincent O'Leary, Clifford D. Clark, Alice Chandler, in his or her capacity as President and chief administrative officer of, respectively, the State University of New York at Albany, the State University of New York at Binghamton, and the State University of New York at New Paltz, New York Public Interest Research Group, Inc., Defendants–Appellees.

No. 698, Docket 91–7877.

United States Court of Appeals,
Second Circuit.

Argued Jan. 10, 1992.

Decided Feb. 13, 1992.

---

Martin S. Kaufman, New York City (Atlantic Legal Foundation, Inc., Douglas Foster, of counsel), for plaintiffs-appellants.

Jocelyn Lee Jacobson, New York City (Alexander R. Sussman, Fried, Frank, Harris, Shriver & Jacobson, of counsel), for defendant-appellee New York Public Interest Research Group, Inc.

Andrea Green, Asst. Atty. Gen. of State of N.Y., Albany, N.Y. (Robert Abrams, Atty. Gen., of counsel), for defendants-appellees State University of N.Y.

Before KAUFMAN *, PRATT and MINER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Thomas Jefferson recognized that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." [1] At the same time, our nation's universities preserve a longstanding tradition of tolerating and even encouraging the propagation of all sorts of disbelieved opinions. We are asked today, in a case that involves competing concerns of the First Amendment, to resolve the conflict that occurs when Jefferson's "tyrannical" compulsion occurs in a collegiate setting. On the one hand, university students oppose as compelled speech and association their college's allotment of a portion of their mandatory student activity fee to an organization whose speech and actions they reject. On the other hand, the university, by disbursing the fee proceeds to a variety of campus groups, aims to foster spirited and uninhibited debate about campus and public issues. We hold that a state university may constitutionally allocate students' activity fees to a group with whose speech some students disagree, as long as that organization spends the equivalent of the students' contribution on campus and thus serves the university's substantial interests in collecting the fee. We also hold that a campus group may not define its membership to include all fee paying students, but

---

* Judge Kaufman wrote this opinion and circulated it to the other members of the panel before his death on February 1, 1992.

1. *Keller v. State Bar of California*, 496 U.S. 1, 10, 110 S.Ct. 2228, 2234, 110 L.Ed.2d 1, 11 (1990) (quoting I. Brant, *James Madison: The Nationalist* 354 (1948)).

may extend membership only to those who seek it.

## BACKGROUND

This action began with a complaint by several students of the State University of New York at Albany[2] ("SUNY Albany") against their university and the New York Public Interest Research Group, Inc. ("NY-PIRG"). Like all SUNY Albany students, appellants are required by a regulation adopted pursuant to New York's Education Law § 355 ("the regulation")[3] to pay a non-refundable student activity fee each semester. Those who fail to pay the fee, $55 as of 1989, are not allowed to register. Student fees are pooled and, according to the regulation, redistributed to a variety of extracurricular organizations, "provided that the purpose and activities of the organization[s] are of [an] educational, cultural, recreational or social nature." If the organizations fit that description, they must then request activity fee funding from, and be selected by, the SUNY Albany Student Association, and approved for such funding by the university's president.[4] The Student Association and the president have consistently used this process to fund a great many organizations, including athletic, social, recreational, service, ethnic and political organizations. For instance, the fee supports an Irish Club, the Korean Students Association, Dance, Theater and New Art Councils, the Black Alliance, the Pan–Caribbean Association, a geography club, Fuerza Latina, the Feminist Alliance, a campus Amnesty International group, the Revisionist Zionist Alternative, the Gay and Lesbian Alliance, NYPIRG and others. Activities conducted by the more ideological organizations range from sponsoring debates, supporting campus journals and newsletters, showing films, and lobbying.

By the terms of a contract between NY-PIRG and the Student Association, NY-PIRG receives $3.00 from each student's activity fee per semester, which amounts to a total of $57,600 for SUNY Albany students per year. NYPIRG is a statewide, not for profit corporation based in New York City with chapters on nineteen SUNY campuses. It is a self-described "nonparti-

---

**2.** The students have had varying ties to this litigation. Michael McChesney was academically dismissed between trial and judgment but is eligible to apply for reinstatement. Hence Judge Owen denied defendants' motion to dismiss, made on mootness grounds, calling McChesney's claim "capable of repetition yet evading review." *Carroll v. Blinken,* 768 F.Supp. 1030, 1031 n. 1 (quoting *Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988)). McChesney moved under Fed. R.Civ.P. 20 to add three new plaintiffs: Christine McClellan, Christopher Sandor and Susanne Zeigler. All are currently enrolled at SUNY Albany, and all assert a right to relief involving the same issues of law and fact and arising out of the same transaction or occurrence as McChesney's. The motion was therefore granted. Thomas Carroll, Robert Carroll, Craig Rucker, Emanuel Panos, Beth Turkovic Garfunkel, Edward Priola and Robert Schmidlin all graduated before trial, and thus seek damages only.

**3.** The regulation, 8 N.Y.C.R.R. § 302.14, provides that students at each SUNY campus will decide, by referendums held at least once every four years, whether to fund extracurricular activities by a mandatory or a voluntary student activity fee. During the years appellants attended SUNY Albany, and now, the fee is mandatory.

**4.** The Student Association budget may only allocate funds to:

> (i) programs of cultural and educational enrichment;
> (ii) recreational and social activities;
> (iii) tutorial programs;
> (iv) athletic programs, both intramural and intercollegiate;
> (v) student publications and other media;
> (vi) assistance to recognized student organizations, provided that the purpose and activities of the organization are educational, cultural, recreational or social nature;
> (vii) insurance related to conduct of these programs;
> (viii) administration of these programs;
> (ix) transportation in support of these programs;
> (x) student services to supplement or add to those provided by the university; and
> (xi) remuneration to student officers for service to student government.

8 N.Y.C.R.R. § 302.14(c). Once the Student Association completes its budget allocating funds to various campus groups, SUNY Albany's president must then certify that Student Association funds are spent in one of the above 11 ways. *Id.*

san research and advocacy organization directed by New York State college and university students." At SUNY Albany, students decide in an advisory referendum held every two years whether to fund NYPIRG through the activity fee, and have always approved it. NYPIRG's Board of Directors is composed entirely of students elected by participating students at the different SUNY chapters. Its overall annual budget is $2.7 million, roughly 30% of which is derived from campus activity fees. The remainder comes from door-to-door collecting (45%), commissions on NYPIRG's fuel buyers groups (15%), and grants (10%). Funds from all sources except grants are commingled into a "general fund," from which all of the organization's statewide expenditures are paid. Hence, student activity fee money helps to pay all of NYPIRG's bills.

NYPIRG spends money from its general fund both at and away from the SUNY Albany campus. For example, at the Albany campus, NYPIRG sponsored a professor's forum on the arms race, a symposium on women's health care, and a debate between representatives of presidential campaigns. Albany students used NYPIRG funds to study the state of lighting in campus parking lots and underground corridors, aiming to enhance safety. They researched safety questions surrounding the use of irradiated food and worked for their elimination on campus. They undertook surveys on the drinking age, local supermarket pricing, local pharmacy compliance with the generic drug laws, and area bank policies on student credit cards. NYPIRG financed research at Albany on divestiture of state money from private institutions doing business in South Africa, the state statute of limitations in toxic tort actions, nuclear power issues and child care. Using NYPIRG funds, Albany students have participated in a small claims court assistance program, local toxic waste clean-ups, and voter registration drives.

NYPIRG spends considerable general fund money away from SUNY Albany as well.[5] Most obviously, it draws from this account to finance activities at the eighteen other campuses where NYPIRG has chapters. Likewise, general fund monies cover the administrative expenses that inevitably attend a large statewide organization. NYPIRG also uses the general fund to pay the salaries of some 60 full-time professional staff members, all but one of whom, as far as we can tell, is employed off the Albany campus. These employees are spread among other participating campuses, NYPIRG's legislative office at the state capitol, and NYPIRG headquarters in New York City. Their salaries consume 54% of NYPIRG's budget. They are scientists, lawyers, researchers, and organizers who, according to NYPIRG's bi-monthly publication *Agenda*, work "to shape public policy and develop citizen participation in areas of consumer protection, government and corporate accountability and economic and social justice." In pursuit of these goals, some NYPIRG staff members also lobby state legislators and executive officials. They do this both alone and with student members and interns.[6] One issue of *Agenda* boasts that NYPIRG's lobbyists had "helped pass over 80 pieces of legislation" by 1988.

There is no doubt that NYPIRG, like many other student groups, is an ideological organization. The issues it pursues, both at SUNY Albany and elsewhere, are chosen by the student Board of Directors. While they range from local concerns like the rates of area taxicabs to international issues like arms control, they represent positions staked out by advocates and cannot be said to be neutral. The organization is for some things—divestment, greater environmental protection, governmental accountability—and against

**5.** This is to expected, since NYPIRG is not primarily a SUNY Albany student group. SUNY Albany President Vincent O'Leary testified at trial that NYPIRG differs from all other campus organizations in that it is not based principally at the Albany campus. Indeed, NYPIRG boasts of 40,000 "citizen members," who contribute to NYPIRG and are not students at all.

**6.** SUNY Albany awards academic credit to a limited group of students who perform internships with NYPIRG.

others—irradiated food, nuclear power, increased defense spending. As the district court stated at trial: "I think you can sort of assume that from the state of this record without any dispute that [NYPIRG] does have a program for affecting political and social action. It is unquestionably so."

One final aspect of NYPIRG requires mention. NYPIRG's by-laws provide that any student who pays the student activity fee, as all SUNY Albany students must, is a "member" of the organization.[7] Apparently on the strength of this by-law, NYPIRG claims in publications to represent all students at the nineteen participating campuses. The record reveals no other student group with a similar, automatic membership plank, nor any other group that claims to speak for all SUNY Albany students.

Opposed to NYPIRG's causes and methods, and dismayed to find themselves financing them and, thus, NYPIRG members, appellants brought an action in the United States District Court for the Southern District of New York (Owen, J.) pursuant to 42 U.S.C. §§ 1983 and 1985(3), 29 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments of the Constitution. They sought to enjoin as unconstitutional compelled speech the allotment of part of their student activity fee to NYPIRG. After denying cross-motions for summary judgment, the district court conducted a six day bench trial. Finding no infringement of appellants' First Amendment rights by SUNY's transfer of activity fee monies to NYPIRG, and convinced that NYPIRG's use of such fees brings educational benefits to Albany students, the district court denied appellants' claim for injunctive relief and dismissed the action.

*Carroll v. Blinken,* 768 F.Supp. 1030 (S.D.N.Y.1991). Appellants now appeal, and we affirm in part, and reverse and remand in part.

## DISCUSSION

As was noted at the outset, this case is one of competing interests. It pits students who object to bankrolling an organization whose political speech and activities they strongly oppose, against their university, whose considered educational judgment it is that students ought to support a wide variety of campus speech, civic activism, and extracurricular activities. We begin by considering the students' First Amendment claims; it is against their right to be free of compelled speech that we weigh the university's interests in compulsion.

### I. *Objecting Students' First Amendment Interests*

■ Appellants' central claim is that the First Amendment prohibits their being charged for and associated with the political activities of an organization they disagree with. Since at least 1943, when the Supreme Court decided *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), it has been firm constitutional doctrine that the state cannot constitutionally compel individuals to speak or think in prescribed ways. In *Barnette,* the Court struck down a West Virginia law intended to bolster Americanism by compelling public school students to salute and pledge allegiance to our flag. As Justice Murphy concurred, the First Amendment "includes both the

---

7. The by-law provision is as follows:

    II. *MEMBERSHIP*

    A. *Participating School*

    A participating school is any public or private college, university, junior college, graduate school, or other institute of learning in New York State which makes an annual financial contribution to NYPIRG and which meets the standards of these By–Laws. An annual financial contribution is defined as funds paid as a substantial part of the term's collection, as determined by the State Board. The State Board, however, may refuse to admit any proposed participating school.

    B. *Member*

    A member is any student at a participating school except for:

    1) At a school with a refund procedure, one who requests a refund.

    2) At a school without a refund procedure, one who indicates her/his wish not to be a member.

    Membership certificates or cards need not be issued by NYPIRG. Membership is effective and evidenced by the donation, refund, and other records kept by NYPIRG.

right to speak freely and the right to refrain from speaking at all." *Id.* at 645, 63 S.Ct. at 1189.

What offended the First Amendment in *Barnette* was the image of state as molder of minds. That we were then at war with governments founded expressly on that ideal, and indeed that the salute West Virginia school children were compelled to perform each morning seemed to parents and others to be "too much like Hitler's," could not have been far from the Justices' minds. *Id.* at 627, 641, 63 S.Ct. at 1179–80, 1186. Hence that passage so quoted by free speech enthusiasts ever since: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642, 63 S.Ct. at 1187. But the freedom to keep silent as well as to speak is grounded in something broader than a national fear of the state. It is equally the product of our view of personhood, which encompasses what the Supreme Court later referred to as "freedom of thought," "freedom of mind" and a "sphere of intellect and spirit." *Wooley v. Maynard,* 430 U.S. 705, 714–715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (quoting, in part, *Barnette,* 319 U.S. at 637, 642, 63 S.Ct. at 1185, 1187). Were there no state at all, or were it inalterably benign, our conception of what it means to be human would still lead us to respect the individual autonomy of intellect and will enshrined in the First Amendment. *See Galda v. Rutgers,* 772 F.2d 1060, 1064 (3rd Cir.1985), *cert. denied, New Jersey Public Interest Group, Inc. v. Galda,* 475 U.S. 1065, 106 S.Ct. 1375, 89 L.Ed.2d 602 (1986) (*"Galda II"*) (compulsory speech acts as "limitation on freedom of conscience").

The principles of *Barnette* have since been applied in a variety of contexts. In *Torcaso v. Watkins,* 367 U.S. 488, 496, 81 S.Ct. 1680, 1684, 6 L.Ed.2d 982 (1961), the Court struck down as invasive of "freedom of belief and religion" Maryland's requirement that civil servants utter oaths affirming belief in God. In *Miami Herald Pub-*

*lishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Court held that a newspaper could not be compelled to print a reply by a political candidate criticized in the paper. In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Court commanded that sheriff's employees could not be compelled to support a political party in order to keep their jobs. In *Wooley,* the Court invalidated New Hampshire's law compelling drivers to endorse that state's motto, "Live Free or Die," by displaying it on their license plates. And in *Pacific Gas & Electric Co. v. Public Utilities Commission of California,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), a utility commission's rule requiring a company to distribute a consumer organization's communications with its bill was overturned as compelled speech. The Court reaffirmed the "concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Id.* at 11, 106 S.Ct. at 909 (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 559, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (quoting *Estate of Hemingway v. Random House,* 23 N.Y.2d 341, 348, 296 N.Y.S.2d 771, 778, 244 N.E.2d 250, 255 (1968) (emphasis in original))); *see also Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) ("[f]reedom of association therefore plainly presupposes a freedom not to associate").

The First Amendment's protections against forced speech and association also underlay the Supreme Court's decision in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and its progeny, on which appellants place greatest reliance and which is most relevant to the case at hand. In *Abood,* non-union teachers were compelled by Michigan's agency shop rules to pay a service charge to the union that negotiated their collective bargaining agreement with the Detroit Board of Education, since they benefitted along with union members from the agreement's negotiation and operation. Claiming that the union's use of their ser-

vice charge to express political opinions and support candidates constituted compelled speech, the non-union teachers sued. The Court agreed, holding that while the union's use of dissenting teachers' money to finance activities germane to collective bargaining is constitutional, *id.* at 225–226, 97 S.Ct. at 1794–1795, use of it to finance political or ideological causes the teachers do not support violates the First Amendment. *"[A]t the heart of the First Amendment,"* the Court stressed, "is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Id.* at 234–235, 97 S.Ct. at 1799 (emphasis added).

In *Abood*'s wake has come *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), which reaffirmed *Abood* and ruled on the germaneness of a variety of union practices, *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), which strengthened union procedures to ensure that objecting employees did not finance nongermane speech, *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), which prohibited a state bar association from using members' dues on political speech unrelated to legal regulation or services, and *Lehnert v. Ferris Faculty Association*, 500 U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), which sanctioned union expenditures of dues on expenses not expressly authorized by statute and for national affiliate activities that benefit local members.

Like non-union employees bound to pay fees to a union that in turn spends the money on political speech, or members of a state bar whose dues finance ideological activities like lobbying, appellants see the student activity fee and its attendant automatic NYPIRG membership as vehicles for compelled speech and association. *See Galda II*, 772 F.2d at 1067 (*Abood* relevant in university context, despite differences between colleges and unions). We agree: NYPIRG engages in political speech, the students help to finance it, and that aid and

the accompanying membership is compelled. First, no one doubts that NYPIRG "speaks" for First Amendment purposes. The district court concluded as much, as was noted above, because the record is clear that NYPIRG advances certain positions on issues of public policy through research, campus speakers, lobbying the legislature, intervening in lawsuits, community organizing, brochures, and other methods. Were the government to try to prevent or penalize these activities, it would certainly be restrained by the Constitution. Second, it is undisputed that all students pay $3.00 each for such speech, as money collected from student activity fees is lumped with NYPIRG's other funds at the statewide level and is distributed to individual chapters, staff members and lobbyists to support the group's efforts. That this slice of the student activity fee is briefly in the hands of the Student Association while being funnelled from students to NYPIRG does not diminish the fact that a transfer has taken place. Students are also drafted into NYPIRG according to the group's automatic membership provision. Finally, this membership and the transfer of funds hinges not on the ideological affinity between member and group, contributor and recipient, but rather on the compulsion inherent in conditioning registration, and hence matriculation and graduation, on payment of the fee. A student cannot pay the full fee without paying NYPIRG and he or she cannot continue as a student without paying the full fee. Whether justified or not, that is forced association and speech—just as conditioning the practice of law in *Keller*, and the retention of work in *Abood, Ellis, Hudson*, and *Lehnert*, on fee payments gave rise to compulsion in those settings.

Appellees maintain, and the district court agreed, that objecting students have not been forced to speak through and associate with NYPIRG because the connection between the two is too attenuated. As the court put it, "the fee supports over 100 diverse groups, and the contributions of the fee are paid by several thousand students. Thus, no close association exists

between plaintiff and NYPIRG, and plaintiff's First Amendment rights are not infringed." *Carroll,* 768 F.Supp at 1035. As a matter of·fact, this proposition may be doubted; as a matter of law, appellants need not show a "close[r] association" than they have to establish an infringement of First Amendment rights.

In fact, appellants are linked more closely to NYPIRG than to other recipients of the student activity fee because,· as far as we can tell, only NYPIRG makes members out of all SUNY Albany students. Having deputized all of its unwitting activity fee contributors and then stating in some of its materials that it represents all fee paying students, NYPIRG cannot now conveniently restore the distance between itself and students when it suits the organization's legal needs. And, even absent the membership provision, it cannot so easily be assumed that outsiders do not link students with at least some of the causes pursued by student organizations, especially when those causes are furthered off campus. As the Fourth Circuit said of the plan of the University of Maryland's PIRG chapter to use activity fees to support litigation, "suits and actions would assume in the public mind the stature of declarations of University thought as well as that of its entire student body, while in truth it could well be neither." *Maryland Public Interest Research Group v. Elkins,* 565 F.2d 864, 867 (4th Cir.1977).

Perhaps more importantly, First Amendment jurisprudence does not require appellants to demonstrate a closer connection between NYPIRG's speech and themselves to make out a constitutional violation. While appellees are correct that *Barnette* and *Wooley* involve citizens compelled actually to speak or carry a message, nowhere did those opinions state or imply that compelled speech has only one *modus operandi.*[8] On the contrary, *Abood* and its proge-

ny illustrate that there is linkage enough in being compelled to fund an unsupported cause.

*By utilizing petitioners' funds* for political lobbying and to garner the support of the public in its endeavors, the union would use each dissenter as "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Maynard,* 430 U.S. at 715, 51 L.Ed.2d 752, 97 S.Ct. [at 1435] 1428. The First Amendment protects the individual's right of ·participation in these spheres from precisely *this type* of invasion.

*Lehnert,* 500 U.S. at ——, 111 S.Ct. at 1960, 114 L.Ed.2d at 591 (emphasis added). *See also Cahill v. Public Service Commission,* 76 N.Y.2d 102, 111–12, 556 N.Y.S.2d 840, 843–44, 556 N.E.2d 133, 136–37 (1990). Moreover, in *Lehnert,* the Court rejected appellees' position when advocated by Justice Marshall, who argued in dissent that merely funding union activities did not "conscript[ ]" dissenters' "expressive capacities." *Id.* 500 U.S. at ——, 111 S.Ct. at 1970, 114 L.Ed.2d at 604 (Marshall, J., concurring in part and dissenting. in part). The fact that appellants' student activity fee will also compel them to speak through a number of other campus groups in addition to NYPIRG in no way heals the constitutional infirmity; it simply means that students must fund more than one unwanted view. *See Galda II,* 772 F.2d at 1067 ("[f]or example, if the university compelled a student to make separate contributions to both the Democratic and Republican National Committees, the evil is not undone; it is compounded"). And since "the extent of one's disagreement with the subject of compulsory speech is relevant to the degree of impingement upon free expression that compulsion will effect," *Lehnert,* 500 U.S. at ——, 111 S.Ct. at 1960, 114 L.Ed.2d

---

**8.** *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), and *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), also stressed by appellees, are not to the contrary because they are not compelled speech cases. They hold only that, having once opened up physical space for ·public or campus use and advocacy—a shopping

center in *Pruneyard* and classrooms in *Widmar*—the space's owner cannot then selectively restrict access. The critical distinction is that appellants have not voluntarily made their pocketbooks publicly accessible for the use of all others besides NYPIRG. Only the very regulation they challenge does that.

at 591, it is not dispositive that others receive appellants' funds along with NYPIRG. Appellants may agree with their speech and many recipients, being athletic, social and service groups, do not speak at all.

In short, appellants' right to be free from compelled speech suffers when NYPIRG uses student funds to raise issues on campus, organize the community and lobby the legislature in pursuit of "economic and social justice." Likewise their right to associate or not with whom they please is compromised by NYPIRG's automatic membership policy. These intrusions must be justified by the state.

## II. SUNY Albany's Interest in Funding NYPIRG from the Student Activity Fee and in NYPIRG's Automatic Membership

Having set forth appellants' interest in averting compulsory speech and association, we must now consider the university's interest in funding NYPIRG from the student activity fee, and by extension allowing NYPIRG to make members of all who pay it. The regulation by which NYPIRG and other groups receive a share of the fee is not intended to restrict free speech. On the contrary, it seeks to expand campus speech by facilitating the activities of a wide variety of speakers. And the funding provision is also content-neutral; that is, it does not grant or withhold funds based on the content of the recipient's speech. We therefore look to see whether the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985); *Ward v. Rock Against Racism*, 491 U.S. 781, 798–799, 109 S.Ct. 2746, 2757–2758, 105 L.Ed.2d 661 (1989); *Schad v. Mount Ephraim*, 452 U.S. 61, 69 n. 7, 101 S.Ct. 2176, 2183 n. 7, 68 L.Ed.2d 671 (1981) ("[e]ven where a challenged regulation restricts freedom of expression only incidentally ... [it] must be narrowly drawn to avoid unnecessary intrusion on freedom of expression"); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *see also* Note, *The Content Distinction in Free Speech Analysis After Renton*, 102 Harv.L.Rev. 1904, 1905–1906 (1989).

It is also important to note that, in scrutinizing the substantiality of SUNY Albany's interest in funding NYPIRG with student activity fees and permitting the membership policy, we accord wide latitude to universities to define and carry out their own educational missions. *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985); *Regents of the University of California v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978). Of course, "state colleges and universities are not enclaves immune from the sweep of the First Amendment," *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972), but academic freedom is itself a concern of that amendment, and it would not long survive in any meaningful way if courts were to take upon the task of micromanaging the everyday affairs of our nation's colleges. *Id.* at 180–181, 92 S.Ct. at 2345–2346; *Ewing*, 474 U.S. at 226, 106 S.Ct. at 513; *Bakke*, 438 U.S. at 312–313, 98 S.Ct. at 2759–2760; *Keyishian v. Board of Regents of the University of the State of New York*, 385 U.S. 589, 602–603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

### A. Funding

SUNY Albany's reasons for allotting a portion of the student activity fee to NYPIRG can be distilled to three distinct interests: 1) the general promotion of extracurricular activities, 2) the facilitation of what the district court called "participatory civics training," *Carroll*, 768 F.Supp at 1033, and 3) the stimulation of robust campus debate on a variety of public issues.

First SUNY's regulation seeks to foster a rich extracurricular life for students at Albany and other campuses. A former chancellor of SUNY Albany put it this way:

The experience of a student on any campus extends beyond a classroom experience. The basic philosophy of an educational experience in any institution that

I am familiar with is to provide for a student as wide a range of opportunities and exposures which will allow for the development of the potentials of an entire individual ... I would stress the importance of [students] reaching out during their undergraduate years to sample, to explore, to see various kinds of activities, because it is one of the rare times in an individual's life when you have an opportunity to learn a great deal more about different kinds of activities and events.

The value to students of participating in a range of extracurricular activities is not limited to the things they do and learn. It also involves the people they encounter in the process. As a president of Princeton University once wrote, "[a] great deal of learning occurs informally. It occurs through interactions among students ... who have a wide variety of interests, talents, and perspectives; and who are able, directly or indirectly, to learn from their differences." *Bakke,* 438 U.S. at 312–13 n. 48, 98 S.Ct. at 2760 n. 48.

Inherent in SUNY's regulation, then, is a particular and of course quite common vision of the university as more than the sum of classes in its course catalog—as a sort of sanctuary where young adults grow in a myriad of ways. *See Widmar v. Vincent,* 454 U.S. 263, 279 n. 2, 102 S.Ct. 269, 279 n. 2, 70 L.Ed.2d 440 (1981) (Stevens, J., concurring) (university "atmosphere" includes extracurricular activities, "critical aspect[s] of campus life"). As was said of the use of a similar activity fee at the University of Nebraska, "[w]ithin wide limitations a state is free to adopt such educational philosophy as it chooses. The Board of Regents of the University of Nebraska obviously has embraced an educational philosophy that the education of students extends beyond that which takes place in the classroom." *Veed v. Schwartzkopf,* 353 F.Supp. 149, 152 (D.Neb.) (holding constitutional the granting of student activity funds to the campus newspaper), *aff'd,* 478 F.2d 1407 (8th Cir. 1973), *cert. denied,* 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974). It is in service of a similar "philosophy" of education that SUNY Albany has established a scheme whereby a multitude of political, educational, social and recreational organizations receives funds from each student's payment of the student activity fee upon registration. The $3.00 allocation to NYPIRG is part of this scheme and, to the administration of SUNY Albany, is consistent with the university's desire to enrich the overall extracurricular lives of students.

The second interest SUNY Albany aims to serve by funding NYPIRG with student activity fees is more strictly educational. NYPIRG, the university believes, teaches specific, concrete skills—research, speaking, writing, organization and advocacy—to those who join it. "Participating students in each area learn about their chosen project; prepare reports, memoranda and press releases; practice public survey techniques; involve themselves in community service efforts; obtain experience in public speaking; sponsor debates; and communicate with their legislative representatives." *Carroll,* 768 F.Supp. at 1032. NYPIRG also instills in students a sense of civic activism and responsibility. By learning about the political process, putting information before the public via research, speakers and debates, and working to change minds and raise consciousness, students enjoy what SUNY Albany President Vincent O'Leary called "an opportunity of participating, it would seem to me, in the most fundamental aspects of a democratic society." Or, as Judge Owen put it at trial, NYPIRG administers "a hands-on civics exercise." SUNY Albany has already demonstrated its interest in teaching students these skills by offering courses in research, writing and government; it may also seek to further that interest by allocating student activity fee money to organizations like NYPIRG that accomplish substantially the same things.

The final, and in our view most important, interest that SUNY Albany tries to advance by funding NYPIRG and other groups with shares of the activity fee is to stimulate uninhibited and vigorous discussion on matters of campus and public concern. At trial, President O'Leary testified that, by funding a wide variety of campus

interest groups like NYPIRG, the activity fee "create[s] a forum for the expression of diverse views at Albany." Such a forum, he continued, is "consonant with the educational mission" of the university. In seeking to foster debate, exchange and contemplation about matters of campus and wider importance, SUNY Albany is hardly assuming a novel collegiate role. As Justice Brennan wrote in *Keyishian*, "[t]he classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" 385 U.S. at 603, 87 S.Ct. at 683 (quoting *United States v. Associated Press*, 52 F.Supp. 362, 372 (1943), aff'd, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945)). Indeed, SUNY Albany's interest in sponsoring and maintaining a thriving campus forum of vigorous advocacy and political action is itself a concern of constitutional dimensions, since a central purpose of the First Amendment is to guarantee the free interchange of views and energetic debate. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) (citing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–1425, 89 L.Ed. 2013 (1945) (First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public"). This constitutional interest is no less forceful or applicable on campus than it is in the community at large. *Ewing*, 474 U.S. at 226 n. 12, 106 S.Ct. at 514 n. 12 (academic freedom, "a special concern of the First Amendment," thrives on "the independent and uninhibited exchange of ideas"); *Healy*, 408 U.S. at 180–181, 92 S.Ct. at 2345–2346. A university where NYPIRG petitions against nuclear power, where environmental groups advocate greater recycling, where opponents of South Africa debate opponents of divestment, and partisans of a dozen other causes press their cases is a university fulfilling its traditional mission in a free society. Were it otherwise, college would be a very quiet, intellectually diminished and ultimately irrelevant place.

Just as SUNY Albany is not unique in defining its role to include the nurturing of campus debate, neither is it unique in using a student activity fee as the means to that end. Other colleges do likewise. Of the allocation of student activity fees to several campus groups at a college of Rutgers, the State University of New Jersey, the Third Circuit commented that:

> This fee, a lump sum used to subsidize a variety of student groups, can be perceived broadly as providing a "forum" for a diverse range of opinion ... Although many student-related groups have ideological overtones, to the extent that the university determines that an organization is an appropriate participant in the total university forum, considerable deference should be accorded that judgment. This deference stems from the long-standing recognition that the university as a whole functions as a forum for the exchange of diverse views.

*Galda v. Bloustein*, 686 F.2d 159, 166 (3rd Cir.1982) (*"Galda I"*); *Widmar*, 454 U.S. at 267–268 n. 5, 102 S.Ct. at 273 n. 5 ("campus of a public university, at least for its students, possesses many of the characteristics of a public forum"); *Galda II*, 772 F.2d at 1064; *Kania v. Fordham*, 702 F.2d 475, 477 (4th Cir.1983); *Veed*, 353 F.Supp. at 153.

We conclude that these three interests—the promotion of extracurricular life, the transmission of skills and civic duty, and the stimulation of energetic campus debate—together are substantial enough to justify the infringement of appellants' First Amendment right against compelled speech that occurs when SUNY Albany transfers a portion of the activity fee to NYPIRG. We also believe that these interests would be served less effectively absent the activity fee distribution regulation. *Albertini*, 472 U.S. at 689, 105 S.Ct. at 2906. Clearly, the ability of NYPIRG and other campus groups to function effectively is tied to the

level of resources they can muster in support of their activities. Of equal importance is the stability and predictability the fee scheme provides; established organizations like NYPIRG that receive repeated Student Association backing can estimate their yearly funding with some accuracy and expect a steady annual flow of money. Viewed from the students' perspective, an alternate funding scheme would seem less likely to commit the university community to the goals of enriching campus life and promoting debate. Rather, funding would be balkanized and students would cease to be linked by a common bond to the tolerant support of all points of view.

While we agree with appellees that activity fee funding of NYPIRG furthers substantial SUNY Albany interests, we nevertheless agree with appellants that they cannot be charged for all NYPIRG expenditures. Taking SUNY Albany students' money and using it, as NYPIRG does, off Albany's campus—to, *e.g.*, pay non-student lobbyists, cover statewide administrative costs, finance other SUNY chapters—stretches the nexus between the extracted fee and SUNY Albany's educational interests too far, beyond what is constitutionally permissible. By allowing student money to finance NYPIRG at all we have already sanctioned a considerable infringement of appellants' freedom from compelled speech. *See Ellis*, 466 U.S. at 455, 104 S.Ct. at 1896 ("by allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights"). Moreover, we are mindful of our duty to ensure that even incidental burdens on speech be "narrowly drawn." *Schad*, 452 U.S. at 69 n. 7, 101 S.Ct. at 2183 n. 7. Hence we are unwilling to go farther than necessary to fulfill SUNY Albany's substantial interests, and do not believe that these concerns can justify NYPIRG's off campus expenditures. Students opposed to NYPIRG can be made to tolerate some compromise of their First Amendment rights when the benefits of a varied extracurricular life, hands-on civics training, and robust campus debate are all around them to approvingly take part in, actively oppose, or merely witness dispassionately

firsthand. *See Lehnert*, 500 U.S. at ——, 111 S.Ct. at 1959–1961, 114 L.Ed.2d at 590–591 (infringement of nonunion workers' First Amendment rights acceptable when they benefit from union's representation and would otherwise be "free riders;" rationale lost when union acts "outside the limited context of contract ratification or implementation"); *Keller*, 496 U.S. at 12, 110 S.Ct. at 2235, 110 L.Ed.2d at 13. These benefits vanish when NYPIRG money is spent in the halls of the state legislature or at the main offices in New York City. SUNY Albany's interests, however substantial, are still, after all, those of the university and its community, not that of an independent statewide organization.

In an attempt to sever NYPIRG's constitutional expenditures from its unconstitutional ones, we could order the organization to segregate its accounts and trace activity fees through the group's funding pipeline—from award by the Student Association through NYPIRG's bank accounts and back to specific campus activities—to make certain no dissenting student paid for an off campus program. Or we could carefully scrutinize each NYPIRG project to see whether it is chiefly "off campus" or "on campus," and thus eligible or ineligible for activity fee funding. But, given our unwillingness to micromanage the affairs of universities and their student organizations, we are reluctant to immerse ourselves to this degree in NYPIRG's inner workings. Instead, we think it sufficient to require that NYPIRG spend as much money on activities at SUNY Albany as it takes in from SUNY Albany students via their activity fees. For example, NYPIRG received $57,600 from Albany students' fees during the 1989–1990 academic year; if it again receives that amount from the Albany Student Association for the 1992–1993 academic year, it must put that figure from its general fund back into projects or expenses at SUNY Albany. This will ensure that, in effect, objecting students like appellants contribute only to NYPIRG programs at SUNY Albany, and not to off campus expenditures on such things as lobbying, staff salaries and administrative

costs. We remand, therefore, and order the district court to fashion, as unintrusively as possible, procedures requiring NYPIRG to confirm in the Albany Student Association budgetary process that it spends at SUNY Albany the equivalent of Albany students' activity fee contribution.[9]

## B. Membership

██ The interests that legitimize SUNY Albany's distribution of students' money to NYPIRG and a host of other organizations do not come close to being sufficiently substantial to justify NYPIRG's automatic membership policy. Once the activity fee has been used to set in place a campus where extracurricular options abound and ideological and other debate is vigorous, students need not be further linked against their will or knowledge with any student organization. Far from fulfilling SUNY Albany's interests in promoting campus pluralism and free choice among several avenues of informal learning, allowing one group to make members of all students gives it an unearned advantage in the campus competition for hearts and minds. More important, it puts the lie to appellees' argument that students are not linked in the popular mind with NYPIRG aims. NYPIRG expressly forges such a link when it proclaims that its "membership" includes all fee paying SUNY Albany students. By overtly and inaccurately claiming to represent the interests of the SUNY Albany student body, NYPIRG has irredeemably trangressed the proscription against forced association.

NYPIRG's membership provision raises similar concerns in this case as New Jersey PIRG's funding did in *Galda I* and *Galda II.* In those cases, NJPIRG was financed with a separate assessment, and was not simply an additional group taking from a larger activity fee as NYPIRG is here. "In that situation," wrote the Third Circuit, "a university's ability to insure a balance in access is infringed." *Galda II,* 772 F.2d at 1067. Here too, NYPIRG's membership provision amounts to special treatment that skews the university's otherwise neutral support of a variety of viewpoints. As automatic membership in NYPIRG serves no substantial SUNY Albany interest, the district court should order NYPIRG to redefine its membership to include only those students who consent to becoming members, and not simply every student who pays an activity fee.

## CONCLUSION

The balance we have attempted to strike between the First Amendment's proscription of compelled speech and association and its concern for uninhibited advocacy and academic freedom may disappoint those in search of decisional absolutes or neat line drawing. We believe it, however, to be a fair accounting of both SUNY Albany's substantial interests and appellants' right to be free of that compelled speech not narrowly in service of those interests. Accordingly, we affirm the allocation of activity fee money to NYPIRG, and reverse and remand with instructions that the district court ensure that NYPIRG spend as much at SUNY Albany as it receives from Albany students' fees, and eliminate NYPIRG's automatic membership scheme. Each party shall bear its own costs on this appeal.

---

9. We note that NYPIRG has already, in the past, submitted reports to the SUNY Albany administration detailing its various programs on campus. These reports were completed in response to requests from the administration, which sought to confirm that NYPIRG was spending activity fees "for the support of programs for the benefit of the campus community," as the regulation requires. Perhaps these reports can be submitted annually, if they are not already, and include specific evidence that NYPIRG spends as much on campus as it takes in from the activity fee.