Justice Breyer,
with whom Justice Kagan joins, dissenting.
In Teachers v. Hudson, 475 U. S. 292 (1986), this Court unanimously held that “the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year.” Id., at 307, n. 18. That is precisely what the *329 union has done in this case. I see no reason to modify Hudson’s, holding as here applied. I consequently dissent.
HH
In Abood v. Detroit Bd. of Ed., 431 U. S. 209 (1977), the Court held that nonunion public employees have a First Amendment right to prevent a union’s spending a part of their compulsory fees on contributions to political candidates or on “expressions of] political views unrelated to [the union’s] duties as exclusive bargaining representative.” Id., at 234. A decade later in Hudson, the Court considered the constitutionality of procedures adopted to implement Abood. In particular, the Court considered the procedures adopted by a teachers union “to draw that necessary line and to respond to nonmembers’ objections to the manner in which it was drawn.” 475 U. S., at 294.
The teachers union had calculated the fee it could charge nonmembers during a particular year on the basis of the expenditures the union actually made during the prior year. Those nonmembers who objected to the apportionment, believing their fee too high, could lodge an objection with the union, proceed through arbitration, and receive a rebate if they won. The Court found this procedure constitutionally inadequate. It thought that (1) a rebate “does not avoid the risk that dissenters’ funds may be used temporarily for an improper purpose,” (2) the union had not provided the nonmembers in advance with “sufficient information to gauge the propriety of the union’s fee,” and (3) the union did not provide objectors with “a reasonably prompt decision by an impartial decisionmaker.” Id., at 305-307.
The Court then held that the Constitution requires that a union collecting a fee from nonmembers provide “an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts *330 reasonably in dispute while such challenges are pending.” Id., at 310.
The Court added that it “recognize[d] that there are practical reasons why ‘[a]bsolute precision’ in the calculation of the charge to nonmembers cannot be ‘expected or required.’” Id., at 307, n. 18 (quoting Railway Clerks v. Allen, 373 U. S. 113, 122 (1963)). It said that the union retains the burden of proving that a given expense is chargeable to nonmembers, the “nonmember’s ‘burden’” being simply that of making “his objection known.” 475 U. S., at 306, n. 16. And it added that the union “cannot be faulted for calculating its fee on the basis of its expenses during the preceding year.” Id., at 307, n. 18.
For the last 25 years unions and employers across the Nation have relied upon this Court’s statements in Hudson in developing administratively workable systems that (1) allow unions to pay the costs of fulfilling their representational obligations to both members and nonmembers alike, while (2) simultaneously protecting the nonmembers’ constitutional right not to support “ ‘ideological causes not germane to [the union’s] duties as collective-bargaining agent.’” Id., at 294 (quoting Ellis v. Railway Clerks, 466 U. S. 435, 447 (1984)). See also Keller v. State Bar of Cal., 496 U. S. 1, 17 (1990) (explaining that Hudson “outlined a minimum set of procedures by which a union in an agency-shop relationship could meet its requirement under Abood”). The Court, in my view, should not depart, or create an exception, from Hudson’s, framework here.
II
Because the administrative details of the fee collection process are critical, I shall begin by explaining how I understand that process to work. The union here followed a basic administrative system that ensures that the fee charged to objecting nonmembers matches their pro rata share of the union’s chargeable expenditures, but it achieves that match only over a period of several years. At the end of 2004, *331 independent auditors determined the amount of chargeable (e. g., collective-bargaining related) expenditures and the amount of nonchargeable (e. g., nongermane political) expenditures that the union actually made during 2004. The union then used the resulting proportion (which was about 56% chargeable, 44% nonchargeable) as the basis for apportioning the next year’s dues. Thus in June 2005, the union sent all represented employees a Hudson notice setting forth that (roughly) 56 to 44 figure. App. 96-106. It provided time for nonmembers to object or to challenge the figure or underlying data. Id., at 98-104. And it then applied the resulting figure to determine the percentage of the total fee that objecting nonmembers would have to pay during the next fee-year, which ran from July 2005 to June 2006. Id., at 102. At the end of 2005, auditors again examined the union’s actual expenditures made during 2005. And the union then used those newly audited figures to determine the chargeable percentage for the fee-year 2006-2007. Id., at 158. Since political expenditures during calendar year 2005 turned out to be lower than in 2004, the new chargeable share amounted to about 69% of the total fee bill. Ibid.
Simplifying further to illustrate, I shall describe the system as (1) using audited accounts for Year One to determine the proportion of the fee that objectors must pay during Year Two, and (2) using audited accounts for Year Two to determine the proportion of the fee that objectors must pay during Year Three. If Year One’s chargeable share (as applied to Year Two) turns out to be too high, Year Two’s audited accounts will reflect that fact, and the payable share for Year Three will be reduced accordingly.
This system does not put typical objectors to any disadvantage. If, say, in Year One total expenses were $1 million, collective-bargaining expenses amounted to $600,000, and political expenses amounted to $400,000, then the union cannot charge objecting nonmembers more than 60% of normal dues in Year Two. If in Year Two collective-bargaining ex *332 penses turned out to be a lesser share of total expenses, say 30%, then the union cannot charge objecting nonmembers more than 30% of the total fee in Year Three. Normally, what the objecting nonmembers lose on the swings they will gain on the roundabouts.
This kind of basic administrative system is imperfect. The nature of a union’s expenditures, including nonchargeable political expenditures, varies from year to year, for political needs differ at different stages of political cycles. Thus, last year’s percentages will often fail to match this year’s expenditures patterns. And the possibility that an objecting nonmember’s funds will temporarily help the union pay for a nonchargeable political expenditure (say, in Year Two) is always present—though in this case that did not happen. See infra, at 334.
Nonetheless this kind of system enjoys an offsetting administrative virtue. It bases fees upon audited accounts, thereby avoiding the difficulties and disagreements that would surround an effort to determine the relevant proportions by trying to measure union expenditures as they occur or by trying to make predictions about the nature of future expenditures. It consequently gives workers reliable information. It gives workers advance notice of next year’s payable charge. It gives nonmembers a “reasonably prompt” opportunity to object. Hudson, 475 U. S., at 310. And, where the chargeable share of next year’s expenses (Year Two) turns out to be lower than last year’s (Year One), it provides offsetting compensation in the form of a lower payable share for the following year (Year Three).
In any event, these features are characteristic of an administrative system that “calculates]” shares of a union’s fee “on the basis of its expenses during the preceding year.” Id., at 307, n. 18. Hudson stated specifically that the “[u]nion cannot be faulted for calculating its fee” on that basis. Ibid. And no party here has challenged the constitutional validity of that basic administrative system. See Tr. of Oral Arg. 13.
*333 I—I 1—1 I—(
If the union’s basic administrative system does not violate the Constitution, then how could its special assessment have done so? In my view, it did not violate the Constitution, and I shall explain my basis for thinking so by considering separately (1) those nonmembers who objected initially to the 2005 Hudson notice, and (2) those nonmembers who did not initially object.
A
The special assessment as administered here has worked no constitutional harm upon those nonunion employees who raised a general objection at the beginning of the year. The union has honored their objections by subtracting from their special payments the same 44% that it subtracts from each of their ordinary monthly payments. App. 309. And we know that the special assessment here did not even work temporary constitutional harm. That is because audited figures showed that the union’s total nonchargeable (e.g., political) expenses for that year ended up as a lower percentage of total expenses than the previous year. Hence the objecting nonmembers ended up being charged too little, not too much, even with the special assessment thrown into the mix.
Let me put the point more specifically. The union’s June 2005 Hudson notice said that the union would charge objecting nonmembers roughly 56% of the dues paid by union members. See App. 102. That 56% figure represented the chargeable portion of expenditures according to the audited figures from 2004. Thus, if the fee charged to a union member pursuant to the 2005 notice was $400, the fee charged to an objecting nonmember was $224. The union similarly prorated the special assessment charging objecting nonmembers 56% of the assessment it imposed upon members. Thus, if the special assessment amounted to $50 for a member, it amounted to $28 for an objecting nonmember. And *334 total dues in this example would have amounted to $450 for a member and $252 for a nonmember.
In the event, the union’s chargeable expenses for 2005— including the funds raised pursuant to the special assessment—amounted to more than 56% of its total expenditures. The auditor’s reports show that the union’s total expenditures in 2005 amounted to $40,045,409. Id., at 166. Chargeable expenses amounted to $27,552,746, which works out to 69% of the total budget. Ibid. Thus, a substantially larger portion of the union’s 2005 spending was chargeable (69%) than it had been in 2004 (56%). Objecting nonmembers therefore paid 56% of normal fees, even though the chargeable share that year was 69%. That is to say, they paid less than what the Constitution considers to be their fair share. See Abood, 431 U. S., at 236-237.
Even were the underlying facts different, I can find no constitutional basis for charging an objecting nonmember less than the 56% that the preceding year’s audit showed was appropriate. In general, any effort to send a new notice and then apply special percentages to a special midyear assessment fee runs into administrative difficulties that, as explained above, are avoided with a retrospective system. See supra, at 332. And, of course, requiring the use of some special proportion based on predicted expenditures would contradict Hudson’s determination that prior year, not present year, expenditures can form the basis for the determination of that proportion. See Hudson, supra, at 307, n. 18.
In the particular example before us these general problems are camouflaged by the fact that the union itself said that the assessment was to be used for political purposes. Hence it is tempting to say that 100% of the assessment is not chargeable. But future cases are most unlikely to be so clear; disputes will arise over union predictions (say, that only 20% of the special assessment will be used for political purposes); and the Court will then perhaps understand the wisdom of Hudson’s holding. In any event, we have made *335 clear in other cases that money is fungible. Retail Clerks v. Schermerhorn, 373 U. S. 746, 753 (1963). Whether a particular expenditure was funded by regular dues or the special assessment is “of bookkeeping significance only rather than a matter of real substance.” Ibid. And, the Court’s focus on the announced purposes of the special assessment, rather than yearly expenditures taken as a whole, is beside the point.
The Court’s response to these problems, particularly the administrative calculation problems, is apparently to depart yet further from the Court’s earlier holdings. It seems to say that an objector can withhold 100%, not simply of a special assessment made for political purposes, but of any special assessment whatsoever, including an assessment made solely for the purpose of paying for extra chargeable costs, such as extended contract negotiations, pension plan experts, or newly assessed contributions to replenish a national union’s collective-bargaining assistance funds. See ante, at 321-322. Although this rule is comparatively simple to administer, it cannot be reconciled with the Court’s previous constitutional holdings. Abood, along with every related case the Court has ever decided, makes clear that the Constitution allows a union to assess nonmembers a pro rata share of fees insofar as they are used to pay for these kinds of collective-bargaining expenses. See 431 U. S., at 234-236; see also Lehnert v. Ferris Faculty Assn., 500 U. S. 507, 524 (1991); Machinists v. Street, 367 U. S. 740, 760 (1961); Ellis, 466 U. S., at 447; Davenport v. Washington Ed. Assn., 551 U. S. 177, 181 (2007); Locke v. Karass, 555 U. S. 207, 210 (2009). How could the majority now hold to the contrary?
If there are good reasons for requiring departure from the basic Hudson-approved administrative system, they are not fhe reasons the Court provides. It suggests that the basic Hudson administrative system gives the union the freedom to misclassify, arguing, for example, that the union has *336 adopted an overly broad definition of changeability. See ante, at 320-321. The 2005 proportion, however, rested upon audited 2004 accounts. While petitioners argue in this Court that the union misclassified parts of the special assessment (which was not imposed until 2005), no brief filed in this case (and certainly no court below) has challenged the accuracy of the 2004 figures or the resulting chargeable/ nonchargeable allocation. Indeed, the 2004 accounts were audited before the special assessment at the center of this case was even imposed. Compare App. 108 (reflecting that the audit of the 2004 budget was completed by April 25,2005) with id., at 25 (reflecting approval of the special assessment on July 30, 2005).
More specifically, the Court suggests that the Constitution prohibits the union’s classification of money spent “ ‘lobbying . . . the electorate’ ” as a chargeable expense. Ante, at 320. But California state law explicitly permits the union to classify some lobbying expenses as chargeable. See Cal. Govt. Code Ann. § 3515.8 (West 2010) (a nonmember’s fair share includes “the costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration”); see also Lillebo v. Davis, 222 Cal. App. 3d 1421, 1442, 272 Cal. Rptr. 638, 651 (1990) (construing §3515.8 narrowly, but explaining that “[w]e cannot fathom how a union’s lobbying the Legislature for improvement of the conditions of employment of the members of its bargaining unit . . . could not be considered to be part of its role as representative . . . ”). No one has attacked the constitutionality of California’s law; no brief argues the question; and this Court does not normally find state laws unconstitutional without, at least, giving those who favor the law an opportunity to argue the matter.
The Court further complains that the basic administrative system requires an objecting nonmember to “come up with the resources to mount” a “legal challenge” to the union’s allocation “in a timely fashion.” Ante, at 319. That concern *337 too is misplaced. The union has offered to pay for neutral arbitration of such disputes before the American Arbitration Association. App. 103-104. And, again, insofar as the Court casts doubt on the constitutional validity of the basic system, the Court does so without the benefit of argument.
Finally, the Court argues that (Step 1) Hudson is “predicated on the assumption that a union’s allocation of funds for chargeable and nonchargeable purposes is not likely to vary greatly from one year to the next,” ante, at 318; that (Step 2) this assumption does not apply to midyear assessments; hence (Step 3) what appears binding precedent (namely, Hudson) does not bind the Court in its interpretation of the Constitution as applied to those assessments. Ante, at 318.
I must jump this logical ship, however, at Step 1. I cannot find in Hudson the “assumption” of uniform expenditures that the Court says underlies it. The assumption does not appear there explicitly. And it is hard to believe any such assumption could implicitly lurk within a ease involving a union’s political expenditures. Those expenditures inevitably vary from political season to season. They inevitably depend upon the number and kind of union-related matters currently visible on the political agenda. Cf., e. g., App. 102, 158, 223 (union’s changeability proportion varies significantly over three years, from 56.35% in 2004, to 68.8% in 2005, to 60.3% in 2006). And it is hard to believe that the Members of this Court, when deciding Abood, were not fully aware of these obvious facts.
B
A stronger case can be made for allowing nonmember employees who did not object at the beginning of the dues year to object (for the first time) to a special assessment. That is because, unlike the nonmember who objected initially, the union will not permit that initially nonobjecting nonmember to withhold anything from the special assessment fee. Nonetheless, there are powerful reasons not to allow the nonmember who did not object initially to the annual fee *338 to object now for the first time to the midyear special assessment.
For one thing, insofar as a new objection permits the new objector to withhold only the portion of the fee that will pay for nonchargeable expenses (as the logic of the concurring Justices would suggest), the administrative problems that I earlier discussed apply. See supra, at 332. That is to say, unions, arbitrators, and courts will have to determine, on the basis of a prediction, how much of the special assessment the new objector can withhold. I concede that many administrative problems could be overcome were the new objector allowed to withhold only the same 44% of the fee that the union here permitted initial objectors to withhold (a figure based on 2004 audited accounts). But no Member of the Court takes that approach.
For another thing, as I have previously pointed out, the Court would permit nonmembers who did not object at the beginning of the year (like those who did then object) to object to (and to pay none of) every special assessment, including those made to raise money to pay additional collective-bargaining expenses. This approach may avoid the uncertainty and resulting disputes inherent in an effort to limit withholding to the nonchargeable portion of the fee. But the price of avoiding those disputes is to reduce the financial contribution the union will receive even when a special assessment pays only for unexpected but perfectly legitimate collective-bargaining expenses. See supra, at 335-337.
Moreover, to provide a new opportunity to object requires providing for explanations, potential challenges, the development of separate accounts, and additional administrative procedures. That means providing extra time and extra money. By definition, however, special assessments are special; time may matter; and unlike the annual dues payment, the union is unlikely to be able to provide what is here a 6-month delay (between the close of the 2004 audited year and the beginning of the next mid-2005 dues year) that can be used to *339 examine accounts and process objections. In a word, a new opportunity to object means time, effort, and funds set aside to deal with a new layer of administrative procedure.
I recognize that allowing objections only once a year is only one possible way to administer a fee-charging system. In principle, one might allow nonmembers to pose new objections to their dues payments biannually, or quarterly, or even once a month, as actual expenses do, or do not, correspond to initial union predictions. But for constitutional purposes the critical fact is that annual objection is at least one reasonably practical way to permit the principled objector to avoid paying for politics with which he disagrees. See Hudson, 475 U. S., at 307, n. 18. And that is so whether ordinary or special assessments are at stake.
Further, the nonmember who did not object initially is not likely to be a nonmember who strongly opposes the union’s politics. That many unions take political positions and that they spend money seeking to advance those positions is not exactly a secret. All those whom this union represents know from history that it spends money each year for nonchargeable purposes. And any nonmember who has significant negative views about such matters is likely to have objected in advance. Those who did not object initially (but do so later) likely include many whose objection rests, not upon constitutionally protected political grounds, but simply upon a desire not to pay a higher fee. And those who withhold fees for that reason are not entitled to constitutional protection in doing so. Here, the nonobjector cannot even claim that an increase in the total fee (by the amount of the special assessment) took him by surprise, for in its initial Hudson notice the union said that “[d]ues are subject to change without further notice to fee payers.” App. 98.
Finally, if the union will not let a nonmember object to a special assessment, that nonmember has an easy remedy. He or she can simply object the first time around. After all, the possibility of a special assessment is known in advance; *340 the possibility that some, or all of it, will help the union make political expenditures is known in advance; the fact that the union will spend a significant amount of ordinary dues upon political matters is known in advance. To obtain protection all a nonmember who believes he might object to some future political expenditure has to do is to object in advance. His or her fees will decline from the beginning. And, if the nonmember forgets to object, there is always next year—when the chargeable amount of the fee will be based on this year’s actual expenditures.
Given these considerations, I do not believe the First Amendment requires giving a second objection opportunity to those nonmembers who did not object the first time.
> 1—1
The Court also holds that, “when a public-sector union imposes a special assessment or dues increase,” it “may not exact any funds from nonmembers without their affirmative consent.” Ante, at 322. In other words, the Court mandates an “opt-in” system in respect to the payment of special assessments.
Justice Sotomayor’s concurring opinion explains why the Court is wrong to impose this requirement. See ante, at 324-328 (opinion concurring in judgment). It runs directly contrary to precedent. No party asked that we do so. The matter has not been fully argued in this Court or in the courts below. I agree with her about this matter.
The decision is particularly unfortunate given the fact that each reason the Court offers in support of its “opt-in” conclusion seems in logic to apply not just to special assessments but to ordinary yearly fee charges as well. At least, its opinion can be so read. And that fact virtually guarantees that the opinion will play a central role in an ongoing, intense political debate.
The debate is generally about whether, the extent to which, and the circumstances under which a union that rep *341 resents nonmembers in collective bargaining can require those nonmembers to help pay for the union’s (constitutionally chargeable) collective-bargaining expenses. Twenty-three States have enacted “right to work” laws, which, in effect, prevent unions from requiring nonmembers to pay any of those costs. See Dept. of Labor, Wage and Hour Division, State Right-to-Work Laws (Jan. 2009), online at http://www.dol.gov/whd/state/righttowork.htm (as visited June 18, 2012, and available in Clerk of Court’s case file). Other States have rejected the “right to work” approach and permit unions to require contributions from nonmembers, while protecting those nonmembers’ right to opt out of supporting the union’s political activities. E. g., Cal. Govt. Code Ann. §§ 3502.5(a), 3515.8. Still others have enacted compromise laws that assume a nonmember does not wish to pay the nonchargeable portion of the fee unless he or she affirmatively indicates a desire to do so. See Wash. Rev. Code § 42.17A.500 (2010) (providing that a union cannot use a nonmember’s agency fee for political purposes “unless affirmatively authorized by the individual”). The debate about public unions’ collective-bargaining rights is currently intense.
The question of how a nonmember indicates a desire not to pay constitutes an important part of this debate. Must the union assume that the nonmember does not intend to pay unless he affirmatively indicates his desire to pay, by “opting in”? Or, may the union assume that the nonmember is willing to pay unless the nonmember indicates a desire not to pay, by “opting out”? Where, as here, nonchargeable political expenses are at issue, there may be a significant number of represented nonmembers who do not feel strongly enough about the union’s politics to indicate a choice either way. That being so, an “opt-in” requirement can reduce union revenues significantly, a matter of considerable importance to the union, while the additional protection it provides primarily helps only those who are politically near neutral. See *342 generally Sunstein & Thaler, Libertarian Paternalism is not an Oxymoron, 70 U. Chi. L. Rev. 1159, 1161 (2003) (explaining that default rules play an important role when individuals do not have “well-defined preferences”)- Consequently, the Court, which held recently that the Constitution permits a State to impose an opt-in requirement, see Davenport, 551 U. S., at 185, has never said that it mandates such a requirement. There is no good reason for the Court suddenly to enter the debate, much less now to decide that the Constitution resolves it.
Of course, principles of stare decisis are not absolute. But the Court cannot be right when it departs from those principles without benefit of argument in a matter of such importance.
For these reasons, with respect, I dissent.